[No. S067060. Mar. 4, 1999.]

KAY DELANEY, Plaintiff and Respondent, v.
CALVIN BAKER, SR., et al., Defendants and Appellants.

## COUNSEL

Klauschie & Shannon, Law Offices of Klauschie & Elie, Thomas J. Kristof; Farmer & Murphy, George E. Murphy and Frank J. Torrano for Defendants and Appellants.

Thelen Reid & Priest, Curtis A. Cole and Matthew S. Levinson for California Medical Association, California Dental Association and California Healthcare Association as Amici Curiae on behalf of Defendants and Appellants.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendants and Appellants.

Foley & Lardner, J. Mark Waxman, Mark E. Reagan and Kenneth L. Burgess for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Appellants

Hanson, Bridgett, Marcus, Vlahos & Rudy, Paul A. Gordon, Robert L. Rusky and James A. Napoli for the California Association of Homes and Services for the Aging as Amicus Curiae on behalf of Defendants and Appellants.

Sanford I. Horowitz; Leslie Ann Clement; and Richard M. Pearl for Plaintiff and Respondent.

Silvio Nardoni; Peter G. Lomhoff; Houck & Balisok, Russell S. Balisok and Steven C. Wilheim for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

Bet Tzedek Legal Services, Eric M. Carlson; Kaye, Scholer, Fierman, Hays & Handler, Carole E. Handler and Rhonda R. Trotter for American Association of Retired Persons and National Citizens' Coalition for Nursing Home Reform, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

Gwilliam, Ivary, Chiosso, Cavalli & Brewer, Eric H. Ivary and James A. N. Smith for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

MOSK, J.—This case is concerned with the relationship between two parts of the Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code[1] section 15600 et seq. (hereinafter the Elder Abuse Act). Section 15657 provides in part that "Where it is proven by clear and convincing evidence that a defendant is liable for physical abuse . . . , neglect . . . , or fiduciary abuse . . . [of an elderly or dependent adult], and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, in addition to all other remedies otherwise provided by law: [¶] (a) The court shall award to the plaintiff reasonable attorney's fees and costs. . . . [¶] (b) The limitations imposed by section 377.34 of the Code of Civil Procedure [forbidding a decedent plaintiff's estate from obtaining pain and suffering damages] shall not apply. However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code [limiting recovery of noneconomic losses to $250,000]." Section 15657.2, on the other hand, states in full: "Notwithstanding this article, a cause of action for injury or damage against a health care provider, as defined in Section 340.5 of the Code of Civil Procedure, based on the health care provider's

---

[1]All statutory references are to this code unless otherwise indicated.

alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."

The question presented by this case is whether a health care provider which engages in the "reckless neglect" of an elder adult within the meaning of section 15657 will be subject to section 15657's heightened remedies, or if section 15657.2 forbids the application of section 15657 under these circumstances. The defendants, a nursing home and two of its owners, argue for the latter position, claiming that the term "based on . . . professional negligence" used in section 15657.2 includes such reckless neglect. The Court of Appeal decided against defendants for reasons explained below. We conclude that the Court of Appeal was correct, but for reasons different from those articulated in its opinion.

## I. *Factual and Procedural Background*

On April 15, 1993, Rose Wallien, the 88-year-old mother of plaintiff Kay Delaney, fell and fractured her right ankle. Unable to care for Ms. Wallien while her ankle healed, plaintiff looked for a skilled nursing facility that could provide the care her mother needed during that time. Plaintiff selected Meadowood Nursing Center, and Ms. Wallien entered the facility on April 20, 1993. Less than four months later, on August 9, 1993, Ms. Wallien died while still a resident at Meadowood. At the time of her death, Ms. Wallien had stage III and stage IV pressure ulcers (commonly known as bedsores) on her ankles, feet, and buttocks. A stage IV bedsore means that her tissue had been eaten away down to the bone.

There was evidence introduced that she was frequently left lying in her own urine and feces for extended periods of time. The neglect was apparently the result, in part, of rapid turnover of nursing staff, staffing shortages, and the inadequate training of employees. The evidence also showed numerous violations of medical monitoring and recordkeeping regulations that prevented necessary information from being transmitted to Wallien's personal physician on a timely basis. The neglect occurred despite plaintiff's persistent complaints to nursing staff, administration, and finally, to a nursing home ombudsman. The facility had been cited for patient neglect by the Department of Health Services (see Health & Saf. Code, § 1424) shortly before Ms. Wallien's admission. After her death, the facility was given a class "A" citation, which is only levied when inadequate care creates "substantial probability that death or serious physical harm . . . would result" to nursing home residents (*id.*, subd. (c)), and the facility was fined $7,500.

Plaintiff brought this action against Meadowood and the two individuals (Calvin Baker, Sr., and Calvin Baker, Jr.) who served as administrators

during portions of the time Ms. Wallien resided at the facility. The case was tried to a jury on theories of negligence, willful misconduct, neglect of an elder as defined by the Elder Abuse Act and wrongful death. On the statutory neglect of an elder theory, the jury was instructed that "[t]he essential elements of such a claim are: [¶] 1. That Mrs. Wallien was 65 years of age or older; [¶] 2. Defendant is liable for neglect as defined, and that [¶] 3. Defendant has been guilty of recklessness, oppression, or malice in the commission of this neglect." The jury instructions defined neglect by reciting the definition of that term in the Elder Abuse Act. (See former § 15610.57.)

The jury found for plaintiff on her negligence and neglect of an elder claims. It found that defendants had not, by clear and convincing evidence, been guilty of "oppression" or "malice" but that they had been "reckless" in their conduct. The jury determined that the damage sustained by Rose Wallien for pain, suffering, inconvenience, physical impairment or disfigurement was $150,000. The jury awarded $15,000 in damages for the past cost of medical and hospital care and treatment resulting from defendants' negligence. The jury attributed 2 percent of the damage to Ms. Wallien's contributory negligence, 79 percent to defendants' negligence and 19 percent to the negligence of Dr. Dean Jennings, who was no longer a defendant. Plaintiff moved for her attorney fees and costs pursuant to section 15657. The court granted the motion and awarded plaintiff $185,723.50 in attorney fees and $32,291.24 in costs. For reasons discussed below, the Court of Appeal affirmed the trial court's judgment. We granted review because of the importance of resolving the question of the relationship between sections 15657 and 15657.2.

## II. *Discussion*

Three distinct positions have been proposed regarding the relationship between sections 15657 and 15657.2. The Court of Appeal's approach, and to some extent plaintiff's, was and is to find that although there may be considerable overlap between actions "based on . . . professional negligence" as set forth in section 15657.2 and the actions specified in section 15657, section 15657 is not thereby limited because section 15657.2 requires only that causes of action based on professional negligence be governed by laws that *specifically* apply to professional negligence actions, in particular the package of legislation referred to as the MICRA,[2] and the statutes that are limited by section 15657 do not "specifically apply" to professional

---

[2]MICRA, the Medical Injury Compensation Reform Act of 1975, refers to several statutes that restrict or place conditions upon causes of action and remedies directed at "health care providers" for "professional negligence." (See Code Civ. Proc., § 364 [requiring 90-day

negligence actions. Rather, section 15657 affects two *generally* applicable statutes. The two statutes are Code of Civil Procedure section 377.34, precluding pain and suffering damages for the estates of deceased victims, and Code of Civil Procedure 1021, providing that, absent a statute, the apportionment of attorney's fees is to be left to the agreement of the parties. Therefore, a cause of action may be both "based on . . . professional negligence" within the meaning of section 15657.2 and be for "reckless neglect" within the meaning of section 15657.

We conclude that this interpretation is not viable. As an initial matter, we note that it is not the only plausible reading of the language of section 15657.2 and particularly of the phrase "specifically apply." The word "specifically" is not necessarily intended to convey the opposite of "generally," but, when read in context, can be taken to mean simply that the law applying to professional negligence alone governs professional negligence causes of action, and that section 15657 is not intended to alter this law.

This reading of section 15657.2 is based in part on the recognition that the MICRA statutes specifically applicable to professional negligence actions implicitly incorporate generally applicable statutes pertaining to civil actions, including the limitations on pain and suffering damages and attorney's fees found in Code of Civil Procedure sections 377.34 and 1021. For example, Business and Professions Code section 6146, a MICRA statute, provides for limits on contingency fees for attorneys who bring actions within the scope of MICRA. As we have stated, one of the purposes of such limits is to discourage "frivolous lawsuits," which may be stimulated by "potentially huge attorney fee awards if cases are won . . . ." (*Roa* v. *Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 931 [211 Cal.Rptr. 77, 695 P.2d 164].) Contingency fee limits would only be successful in furthering this legislative goal, however, if the rule inherent in Code of Civil Procedure section 1021—that each party is to pay its own attorney's fees—governs. Thus, Business and Professions Code section 6146, "specifically" applicable to professional negligence actions, appears to implicitly incorporate the generally applicable Code of Civil Procedure section 1021.

■ Given that the language of section 15657.2 is ambiguous, we "examine the history and background of the statutory provision in an attempt to ascertain the most reasonable interpretation of the measure." (*Watts* v.

---

notice prior to bringing lawsuit]; *id.*, § 667.7 [permitting periodic payment of any judgment against the provider]; *id.*, § 1295 [requiring a certain type of notice for providers' mandatory arbitration provisions]; Bus. & Prof. Code, § 6146 [providing caps on attorney contingency fees]; Civ. Code, § 3333.1 [making admissible evidence of workers' compensation or disability payments]; and *id.*, § 3333.2 [providing a $250,000 cap on noneconomic damages].)

*Crawford* (1995) 10 Cal.4th 743, 751 [42 Cal.Rptr.2d 81, 896 P.2d 807].)
The legislative history shows that the Court of Appeal's interpretation is not plausible; rather it indicates that those who enacted the statute thought that the term "professional negligence," at least within the meaning of section 15657.2, was mutually exclusive of the abuse and neglect specified in section 15657. This is seen most clearly in the Legislative Counsel's Digest to the 1991 amendments to the Elder Abuse Act (Sen. Bill No. 679 (1991-1992 Reg. Sess.)), which included section 15657 and 15657.2. The digest describes section 15657.2 as follows: "This bill would also specify that actions against health care professionals for professional negligence shall be governed by laws specifically applicable to professional negligence actions, *rather than by these provisions*." (Legis. Counsel's Dig., Sen. Bill No. 679 (1991-1992 Reg. Sess.), p. 1, italics added.)[3] Similarly, the bill was described in the Assembly Subcommittee on the Administration of Justice as follows: "This bill does not apply to professional negligence actions against health care providers. Such action shall be *exclusively* governed by existing statutory provisions." (Assembly Subcom. on Admin. of Justice, Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended July 16, 1991.) Similar evidence can be found in the Senate Judiciary Committee's analysis of the bill (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) Apr. 30, 1991, p. 2) and throughout the legislative history of the 1991 amendments.

This leaves a choice between defendants' position and the positions of amici curiae Consumer Attorneys of California (joined to some degree by California Advocates for Nursing Home Reform, Inc., herein collectively referred to as amici curiae).[4] Defendants argue the term "based on . . . professional negligence" covers all conduct "directly related to the rendition of professional services" (*Central Pathology Service Medical Clinic, Inc.* v.

---

[3]Defendants request judicial notice of various legislative history materials. We grant their request to notice exhibit A, which consists of legislative history materials to Senate Bill No. 679. (See Evid. Code, § 452, subd. (c); *Mangini* v. *R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1064 [31 Cal.Rptr.2d 358, 875 P.2d 73].) We deny their request to notice exhibits B and C. Exhibit B consists of the legislative history of Assembly Bill No. 1147 (1997-1998 Reg. Sess.), which purported to clarify the meaning of the 1991 amendments, and which was not enacted. Assembly Bill No. 1147 essentially adopted the position that health care providers are fully subject to section 15657, and adopts a narrow reading of "professional negligence." Exhibit C consists of the legislative history of Senate Bill No. 83 (1989-1990 Reg. Sess.), a proposed amendment to the Elder Abuse Act (never enacted) preceding the 1991 amendments. These exhibits are irrelevant to our inquiry. (Evid. Code, §§ 454, subd. (a), 459, subds. (a) & (b).)

[4]Amicus curiae briefs have also been received from the American Association of Retired Persons and National Citizens' Coalition for Nursing Home Reform on behalf of plaintiff; and from Association for California Tort Reform, California Association of Health Facilities, California Medical Association, California Dental Association, and California Healthcare Association on behalf of defendants.

*Superior Court* (1992) 3 Cal.4th 181, 192 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*)—a reading they argue would broadly exempt from the heightened remedies of section 15657 health care providers who recklessly neglect elder and dependent adults. Amici curiae read the term "based on . . . professional negligence" much more narrowly, and argue that "reckless neglect" under section 15657 is distinct from causes of action "based on . . . professional negligence" within the meaning of section 15657.2, and so health care providers who engage in such neglect would be subject to section 15657's remedies. As explained below, we believe amici curiae's position is the one that most clearly follows the language and purpose of the statute.

The starting point of our analysis is the language of the statutes themselves. "Professional negligence" in section 15657.2 is defined elsewhere as a "negligent act or omission to act by a health care provider in the rendering of professional services." (Code Civ. Proc., § 340.5.) ■ Generally "negligence" is the failure " 'to exercise the care a person of ordinary prudence would exercise under the circumstances.' " (*Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997 [35 Cal.Rptr.2d 685, 884 P.2d 142], fn. omitted.) "Professional negligence" is one type of negligence, to which general negligence principles apply. "With respect to professionals, their specialized education and training do not serve to impose an increased duty of care but rather are considered additional 'circumstances' relevant to an overall assessment of what constitutes 'ordinary prudence' in a particular situation. Thus, the standard for professionals is articulated in terms of exercising 'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing . . . .' " (*Id.* at pp. 997-998.)

■ In order to obtain the remedies available in section 15657, a plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct. The latter three categories involve "intentional," "willful," or "conscious" wrongdoing of a "despicable" or "injurious" nature. (Civ. Code, § 3294, subd. (c); see also *College Hospital, Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 721 [34 Cal.Rptr.2d 898, 882 P.2d 894].) ■ "Recklessness" refers to a subjective state of culpability greater than simple negligence, which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur (BAJI No. 12.77 [defining "recklessness" in the context of intentional infliction of emotional distress action]); see also Rest.2d Torts, § 500.) Recklessness, unlike negligence, involves more than "inadvertence, incompetence, unskillfulness, or a failure to take precautions" but rather rises to the level of a "conscious choice of a course of action . . . with knowledge of

the serious danger to others involved in it." (Rest.2d Torts, § 500, com. (g), p. 590.)[5]

 Section 15657.2 can therefore be read as making clear that the acts proscribed by section 15657 do not include acts of simple professional negligence, but refer to forms of abuse or neglect performed with some state of culpability greater than mere negligence. Thus, amici curiae argue, causes of actions within the scope of section 15657 are not "cause[s] of action . . . based on . . . professional negligence" within the meaning of section 15657.2. Defendants claim that such an interpretation would render section 15657.2 surplusage because section 15657 already on its face excludes actions based on professional negligence strictly construed. We disagree. The Legislature could have reasonably decided that an express statement excluding professional negligence from section 15657 was needed because the language of section 15657, and in particular the terms "neglect" and "recklessness," may have been too indefinite to make sufficiently clear that "professional negligence" was to be beyond the scope of section 15657.

Amici curiae's interpretation is supported by the legislative history of section 15657. The sponsor of the legislation, the Beverly Hills Bar Association, was quoted in a Senate committee analysis appearing shortly before the bill's enactment as "argu[ing] strenuously that the high standard imposed by the bill—clear and convincing evidence of (i) liability and (ii) recklessness, malice, oppression or fraud—adequately protects providers of care from acts of simple negligence, or even gross negligence. [Senate Bill No.] 679 only pertains to acts of egregious abuse. The sponsor argues that existing limitations on damages and fees should not apply in such extreme cases." (Sen. 3d reading analysis, Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended Sept. 10, 1991, p. 2.)

If, on the other hand, the Legislature meant in section 15657.2 to exempt health care professionals in large part from section 15657 liability, why would it use the term "professional negligence" in the former section when, as discussed above, negligence is commonly regarded as distinct from the reckless, malicious, oppressive or fraudulent conduct with which section 15657 is concerned? We do not believe the Legislature "would . . . have chosen such an obscure mechanism to achieve its purpose." (*Murillo* v. *Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 992 [73 Cal.Rptr.2d 682, 953 P.2d 858].)

---

[5]We note that the term "reckless" was defined for the jury in this case as follows: "Reckless means that a person is aware of and consciously disregards a substantial and unjustifiable risk that his or her act will cause injury. The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Defendants do not claim this instruction was in error.

Amici curiae's position is also supported by a consideration of the differing purposes of MICRA and the Elder Abuse Act. The purpose of the latter is essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect. As the Court of Appeal, in *ARA Living Centers-Pacific, Inc.* v. *Superior Court* (1993) 18 Cal.App.4th 1556, 1559 [23 Cal.Rptr.2d 224] (*ARA Living Centers*), has stated regarding the genesis and development of the Elder Abuse Act: "In 1982, the Legislature recognized 'that dependent adults may be subjected to abuse, neglect, or abandonment and that this state has a responsibility to protect such persons.' (Former § 15600, added by Stats. 1982, ch. 1184, § 3, p. 4223.)" It adopted measures designed to encourage the reporting of such abuse and neglect. (§ 15601 et seq.) Subsequent amendment refined the 1982 enactment, but the focus remained on reporting abuse and using law enforcement to combat it (see *ARA Living Centers*, *supra*, 18 Cal.App.4th at p. 1560). Also, Penal Code section 368 was enacted, making it a felony or misdemeanor (depending on the circumstances), for, among other things, a custodian of an elder or dependent adult to willfully cause or permit various types of injury. (Stats. 1986, ch. 769, § 1.2, p. 2531.)

In the 1991 amendments at issue here, the focus shifted to private, civil enforcement of laws against elder abuse and neglect. "[T]he Legislature declared that 'infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits.' (§ 15600, subd. (h), added by Stats. 1991, ch. 774, § 2.) It stated the legislative intent to 'enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults.' (*Id.*, subd. (j))" (*ARA Living Centers*, *supra*, 18 Cal.App.4th at p. 1560.) As was stated in the Senate Rules Committee's analysis of Senate Bill No. 679, "in practice, the death of the victim and the difficulty in finding an attorney to handle an abuse case where attorneys fees may not be awarded, impedes many victims from suing successfully. [¶] This bill would address the problem by: . . . authorizing the court to award attorney's fees in specified cases; [and by] allowing pain and suffering damages to be awarded when a verdict of intentional and reckless abuse was handed down after the abused elder dies." (Sen. Rules Com., Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended May 8, 1991, p. 3.)

MICRA has a different focus. The impetus for MICRA was the rapidly rising costs of medical malpractice insurance in the 1970's. "The inability of doctors to obtain such insurance and reasonable rates is endangering the health of the people of this State, and threatens the closing of many

hospitals." (Governor's Proclamation to Leg. (May 16, 1975) Stats. 1975 (Second Ex. Sess. 1975-1976) p. 3947, and quoted in *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 363, fn. 1 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].) The response was to pass the various statutes that comprise MICRA to limit damages for lawsuits against a health care provider based on professional negligence. (Civ. Code, §§ 3333.1, 3333.2; Code Civ. Proc., § 667; Bus. & Prof. Code, § 6146.)

This difference in focus can be clarified by considering the differing types of conduct with which section 15657 and MICRA are concerned. As discussed, section 15657 concerns "neglect" "physical abuse" and "fiduciary abuse." Former section 15610.57 defines neglect as "the negligent failure of any person having *the care or custody of an elder or a dependent adult* to exercise that degree of care which a reasonable person in a like position would exercise. Neglect includes, but is not limited to, all of the following: [¶] (a) Failure to assist in personal hygiene, or in the provision of food, clothing or shelter. [¶] (b) Failure to provide medical care for physical and mental health needs. . . . [¶] (c) Failure to protect from health and safety hazards. [¶] (d) Failure to prevent malnutrition." (Italics added.) Thus, neglect within the meaning of former section 15610.57 appears to cover an area of misconduct distinct from "professional negligence" in section 15657.2: "neglect" as defined in former section 15610.57 and used in section 15657 does not refer to the performance of medical services in a manner inferior to " 'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing' " (*Flowers* v. *Torrance Memorial Hospital Medical Center, supra,* 8 Cal.4th at p. 998), but rather to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations. It is instructive that the statutory definition quoted above gives as an example of "neglect" not negligence in the undertaking of medical services but the more fundamental "[f]ailure to *provide* medical care for physical and mental health needs." (Former § 15610.57, subd. (b).) "Physical abuse" and "fiduciary abuse" in section 15657, as defined (see §§ 15610.63, 15610.30), are forms of intentional wrongdoing that also differ from "professional negligence."

The difficulty in distinguishing between "neglect" and "professional negligence" lies in the fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional medical care. When, for example, a nursing home allows a patient to suffer malnutrition, defendants appear to argue that this was "professional negligence," the inability of nursing staff to prescribe or execute a plan of furnishing sufficient nutrition to someone too infirm to attend to that need herself. But such

omission is also unquestionably "neglect," as that term is defined in former section 15610.57.

Section 15657 provides the way out of this ambiguity: if the neglect is "reckless[]," or done with "oppression, fraud or malice," then the action falls within the scope of section 15657 and as such cannot be considered simply "based on . . . professional negligence" within the meaning of section 15657.2. The use of such language in section 15657, and the explicit exclusion of "professional negligence" in section 15657.2, make clear the Elder Abuse Act's goal was to provide heightened remedies for, as stated in the legislative history, "acts of egregious abuse" against elder and dependent adults (Sen. 3d reading analysis, Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended Sept. 10, 1991, p. 2), while allowing acts of negligence in the rendition of medical services to elder and dependent adults to be governed by laws specifically applicable to such negligence. That only these egregious acts were intended to be sanctioned under section 15657 is further underscored by the fact that the statute requires liability to be proved by a heightened "clear and convincing evidence" standard.

Defendants contend, as noted, that the term "based on . . . professional negligence," used in section 15657.2, applies to any actions directly related to the professional services provided by a health care provider. The adoption of such a position would produce an anomalous result. It would make the determination as to whether the "recklessly neglectful" custodians of an elderly person were subject to section 15657 turn on the custodian's licensing status: A custodian who allowed an elder or dependent adult in his or her care to be become malnourished would be subject to 15657's heightened remedies only if he or she was *not* a licensed health care professional.

There is no indication that the Legislature intended this anomaly. First, as noted, "neglect" under the Elder Abuse Act refers to the acts or omissions of "any person having the care or custody of an elder or a dependent adult." (Former § 15610.57.) "Abuse of an elder or a dependent adult" is defined in section 15610.07 as "physical abuse, neglect, fiduciary abuse, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering, or the deprivation by a *care custodian* of goods or services necessary to avoid physical harm or mental suffering." (Italics added.) The Elder Abuse Act in turn defines "care custodians" at section 15610.17, subdivision (a) to include "Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code," which includes nursing homes, as well as a number of other professionally operated facilities.

Second, the legislative history demonstrates that one of the main purposes of section 15657 was the elimination of the institutional abuse of the elderly

in health care facilities. Included in the packet of legislative materials for Senate Bill No. 679 was the executive summary to the then-recently issued April 1991 report of the Little Hoover Commission entitled "Skilled Nursing Homes: Care Without Dignity." (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended June 13, 1991, p. 2.) As one legislative committee analysis stated: "The author [presumably Senator Mello] argues that all reasonable steps to combat elder abuse must be taken. [¶] . . . [T]he author refers the subcommittee to the April [1991] report . . . 'Skilled Nursing Homes: Care Without Dignity.' This report chronicles the 'pain and suffering' endured by 'too many' of California's 120,000 residents of such facilities." (Assem. Subcom. on Admin. of Justice, Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) as amended July, 12, 1991, p. 3.)

The legislative history also discloses the assumption of opponents of Senate Bill No. 679 that the heightened remedies of section 15657 were to apply to health care providers. Notwithstanding the fact that section 15657.2 (originally designated 15662) was included in Senate Bill No. 679 from the very beginning (see Sen. Bill No. 679, 1st reading Mar. 5, 1991 (1991-1992 Reg. Sess.)), the California Association of Health Facilities, as the representative of the nursing home industry, opposed the bill. Its statement of opposition was incorporated in legislative committee analyses. "In opposition to this bill, the California Association of Health Facilities argues that [it] poses a real threat to healthcare institutions and healthcare professionals alike. They believe that the effect of this bill will be to focus additional claims on healthcare providers, and to increase their exposure in litigation. 'The net result will simply be higher insurance premiums for health care providers of all types.' " (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 679 (1991-1992 Reg. Sess.) p. 4.) The association withdrew its opposition only after a number of amendments it proposed designed to limit exposure of health facilities to damages, such as the imposition of a damage cap on pain and suffering damages (§ 15657, subd. (b)) and the placement of limitations on employer liability (§ 15657, subd. (c)), were included in the final legislation.[6] (See Assem. Com. on Judiciary, Republican Analysis of Sen. Bill No. 79 (1991-1992 Reg. Sess.) as amended July 12, 1991, p. 1.)

·From this legislative history, it appears clear that both the Legislature that enacted Senate Bill No. 679 and the opponents of Senate Bill No. 679

---

[6]Also, earlier versions of Senate Bill No. 679 contained a more expansive definition of elder abuse under section 15657 (at that time designated as 15660). As originally introduced, elder abuse encompassed all conduct within the scope of former section 15610, which included "physical abuse, neglect, intimidation, cruel punishment, fiduciary abuse, abandonment, isolation, or other treatment resulting in physical harm or pain or mental suffering, or the deprivation by a care custodians of goods and services which are necessary to avoid physical harm or mental suffering." (See former § 15610, added by Stats. 1982, ch. 1184, § 3, p. 4223.)

understood that one of the major objectives of this legislation was the protection of residents of nursing homes and other health care facilities. It is contrary to this objective to then read the phrase "based on . . . professional negligence" found in section 15657.2 to mean that nursing homes or other health facilities are largely exempt from liability under section 15657 for the heightened remedies to which custodians who are not health care professionals are subject.

Defendants' principal argument in favor of their position is their claim that our holding in *Central Pathology, supra,* 3 Cal.4th 181, supports it. They contend that the term "based on . . . professional negligence" means the same as "arising out of professional negligence," as the term was interpreted in *Central Pathology,* and that that court interpreted the latter phrase to mean any act "directly related to defendants' performance of professional services." (*Id.* at p. 193.) But, as explained below, defendants have given *Central Pathology* a broader reading than was intended.

In *Central Pathology,* the court considered Code of Civil Procedure section 425.13, a statute passed in 1987 and amended to its present form in 1988. Code of Civil Procedure section 425.13 is distinct from the MICRA legislation passed over a decade earlier. Code of Civil Procedure section 425.13, subdivision (a) (hereafter section 425.13(a)) provides in pertinent part: "In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code." The *Central Pathology* court considered whether section 425.13 (a) applied in a case against health care providers that alleged both medical negligence and intentional torts (intentional infliction of emotional distress and fraud) in connection with a failure to timely alert plaintiff to the onset of her cancer.

The court began with an inquiry into the language of the statute. It first noted that "professional negligence" was defined by MICRA, as discussed above, as " 'a negligent act or omission to act by a health care provider in the rendering of professional services.' " (*Central Pathology, supra,* 3 Cal.4th at p. 187.) The court then turned to the meaning of the phrase "arising out of." The court found the phrase "arising out of" had been equated with "origination, growth or flow from the event" but stated that it

was "unclear whether the intentional tort causes of action in this case may be said to originate, grow, or flow from 'professional negligence.'" (*Id.* at p. 188.) Because the question before the court was not resolved by examination of the language of the statute, it then turned to its legislative history. (*Central Pathology, supra,* 3 Cal.4th at pp. 188-192.)

The legislative history revealed that section 425.13, as originally passed in 1987, had simply applied to *all* claims against health care providers. (*Central Pathology, supra,* 3 Cal.4th at pp. 188-189.) When that section was amended in 1988, the court observed, the comment of the Assembly Subcommittee on the Administration of Justice stated: "'This bill is intended to correct an oversight. As written, Section 4215.13 [*sic*] could apply to any lawsuit against any health care provider . . . . *Arguably, this could include lawsuits unrelated to the practitioner's practice, such as defamation, fraud, and intentional torts.* [¶] The author [of the original version of section 425.13] asserts that the intention . . . was to provide protection to health practitioners in their capacity as practitioners. Specifically, relief was sought from unsubstantiated claims of punitive damages in actions alleging professional negligence. There was no intent to protect practitioners in any other capacity. [The amendment] limits the application of Section [425.13(a)] to lawsuits involving allegations of a health practitioner's "professional negligence."'" (*Central Pathology, supra,* 3 Cal.4th at p. 189, some italics omitted.)

The *Central Pathology* court then concluded "The Assembly subcommittee's comment emphasizes that lawsuits *unrelated* to a practitioner's conduct in providing health care related services were intended to be excluded from the ambit of section 425.13. Plaintiffs contend that the inclusion of the term 'intentional torts' in the list of lawsuits assumed to be unrelated to the practitioner's practice demonstrates that the Legislature intended to exclude all intentional torts from the requirements of section 425.13. From our review of the history of the statute, however, we conclude that the reference to 'intentional torts' by the author of the comments does not belie its statement of the essential purpose of the amendment—to restrict the application of section 425.13 to lawsuits brought against health practitioners 'in their capacity as practitioners.'" (3 Cal.4th at p. 190.)

The *Central Pathology* court's reasoning was based on an examination not only of the particular legislative history of section 425.13 (a), but also of the statute's purposes. As the court stated, "Under [a contrary] reading of section 425.13(a), injured patients seeking punitive damages in an action involving professional negligence could readily assert that their health care providers committed an intentional tort and that the patients seek punitive damages only in connection with the intentional tort. By including a cause of

action for an intentional tort in a negligence action, plaintiffs would sidestep section 425.13(a) and the resulting procedural requirements the Legislature sought to impose on them. Thus, [such an interpretation] of section 425.13(a) effectively permits artful pleading to annul the protection afforded by that section." (3 Cal.4th at p. 191.)

Moreover, the court reasoned that a contrary reading would lead to an absurd result. "If we were to accept the [contrary] interpretation of 425.13(a), the section's protections would apply only to 'nonintentional tort' conduct that gives rise to punitive damages. There are, however, few situations in which claims for punitive damages are predicated on mere negligence or a conscious disregard of the rights or safety of others and in which no intentional torts are alleged. [Citation.] An interpretation of the statute that would restrict its applicability to such a limited category of cases is inconsistent with the intention of the Legislature to protect health care providers from frequently pleaded and frivolous punitive damage claims. . . . [S]uch an interpretation would render the statute virtually meaningless." (*Central Pathology, supra,* 3 Cal.4th at p. 191.)

Therefore, in considering the scope of section 425.13(a), the court summarized: "We recognize that in the medical malpractice context, there may be considerable overlap of intentional and negligent causes of action. Because acts supporting a negligence cause of action might also support a cause of action for an intentional tort, we have not limited application of MICRA provisions to causes of action that are based solely on a 'negligent act or omission' as provided in these statutes. To ensure that the legislative intent underlying MICRA is implemented, we have recognized that the scope of conduct afforded protection under MICRA provisions (actions 'based on professional negligence') must be *determined after consideration of the purpose underlying each of the individual statutes.*" (*Central Pathology, supra,* 3 Cal.4th at p. 192, italics added.) The court concluded, for reasons discussed above, that given the purpose underlying section 425.13 (a), the phrase "arising out of professional negligence" should be interpreted to pertain to causes of action "directly related to the manner in which professional services were provided" regardless of whether these claims could be characterized as negligent or intentional torts. (3 Cal.4th at p. 192.)

The *Central Pathology* court made clear that it was not deciding the meaning of the term "professional negligence" used in MICRA or in statutes other than section 425.13(a). As the court stated: "Whether professional negligence, as defined in MICRA statutes, *includes* intentional torts *is not the question.* Rather, the trial court must determine whether a plaintiff's action for damages is one *'arising out of* professional negligence of a health care

provider.' (§ 425.13(a), italics added.) Based on the language of [section 425.13(a)] *and its legislative history*, we conclude that an action for damages arises out. of the professional negligence of a health care provider if the injury for which damages are sought is directly related to professional services provided by a health care provider." (*Central Pathology, supra,* 3 Cal.4th at p. 191, some italics added.)

Thus, the *Central Pathology* court did not purport to universally define the phrase "arising out of professional negligence" much less the phrase "based on professional negligence." It rejected the contention that the language of the phrase itself yielded a single, definitive, meaning.[7] Rather, the court recognized that the scope and meaning of these phrases could vary depending upon "the purpose underlying each of the individual statutes." To claim that the *Central Pathology* definition extended beyond section 425.13(a) is to ignore the limitations that this court put on its own opinion. Moreover, after its statement that "the scope of conduct afforded protection under MICRA (actions 'based on professional negligence') must be determined after consideration of the purpose underlying each of the individual statutes" (*Central Pathology, supra,* 3 Cal.4th at p. 192), the *Central Pathology* court cited with approval *Waters* v. *Bourhis* (1985) 40· Cal.3d 424, 435-436 [220 Cal.Rptr. 666, 709 P.2d 469], which suggested a different interpretation of the phrase "based on professional negligence" within the context of Business and Professions Code section 6146.

In the present case we find that the Elder Abuse Act presents a very different statutory scheme from section 425.13(a) discussed in *Central Pathology.* Interpreting the phrase "based on professional negligence" narrowly would not render section 15657 meaningless, as was the case with section 425.13(a). Rather, such an interpretation would enhance the former statute's remedial purpose, protecting elder and dependent adults who are residents of nursing homes and other health care facilities from reckless neglect and various forms of abuse. Indeed, as discussed, this interpretation would avoid the anomaly of having health care professionals exempted from section 15657's heightened remedies for the very same misconduct for which non-professionals would be liable.

---

[7]Defendants point to a footnote in *Central Pathology* in support of their broad reading of that case, which states: "We agree with amici curiae California Medical Association et al. that committee reports before the Legislature at the time it was considering amending section 425.13 indicate the Legislature did not intend to distinguish the terms 'based upon' and 'arising out of.' The reports state, 'There is substantial precedent for [the amendment]. The provisions of [MICRA] all pertain to claims of "professional negligence." ' [Citations.]" (*Central Pathology, supra,* 3 Cal.4th at pp. 187-188, fn. 3.) But this meant only that there is no independent significance to the fact that the drafters of section 425.13 used the term "arising out of" instead of "based on" professional negligence, not that either phrase has one invariable meaning.

Moreover, there is no comparable legislative history in the Elder Abuse Act that would suggest an expansive reading of the phrase "based on professional negligence." There is no suggestion in that history that the Legislature meant by "based on professional negligence" to refer to any action "against health practitioners 'in their capacity as practitioners.'" On the contrary, as discussed, the legislative history suggests that nursing homes and other health care providers were among the primary targets of the Elder Abuse Act.

The other reason supporting *Central Pathology*'s holding —preventing the frustration of the statute's purpose through artful pleading—is also not applicable to section 15657. Regardless of what plaintiffs plead, they would not be entitled to the heightened remedies of section 15657 unless they proved statutory abuse or neglect committed with recklessness, oppression, fraud or malice. Of course, the existence of such a remedy may increase the settlement value of the claim, but only to the extent that the facts indicate that defendant had committed reckless neglect, etc. Such increase in settlement value bolsters, rather than frustrates, the purpose of section 15657.

In the present case, there is substantial evidence that Rose Wallien was subject to neglect in that defendants failed, over an extended period of time, to attend to her advanced bedsores, and otherwise neglected her in such a way as to contribute to her pain and suffering and eventual death. There is also substantial evidence to support the jury's finding that the conduct was reckless, given defendants' knowledge of Wallien's deteriorating condition and plaintiff's repeated effort to intervene in her mother's behalf. Defendants do not challenge the sufficiency of the evidence as to either the "neglect" or "recklessness" findings. Substantial evidence therefore supports the awarding of attorney's fees and pain and suffering damages to her estate, as section 15657 permits, for defendants' reckless neglect.

We emphasize that our interpretation of the phrase "based on professional negligence" found in the unique statutory scheme of the Elder Abuse Act is not necessarily applicable to other statutes in which that phrase appears. Consistent with the *Central Pathology* court, we stress that the meaning of the phrase would depend upon the legislative history and underlying purpose of each of the statutes. (*Central Pathology, supra,* 3 Cal.4th at p. 192.) Specifically, we do not purport to construe the meaning of the same phrase within the context of the MICRA statutes. ▮ It is, of course, "generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute." (*People* v. *Dillon* (1983) 34 Cal.3d 441, 468 [194 Cal.Rptr. 390, 668 P.2d 697].) But that presumption is rebuttable if there are

contrary indications of legislative intent. And the presumption does not apply when the same or a similar phrase appears in different statutory schemes with distinct designs and objectives.[8] Establishing terminological uniformity throughout our codified law is less important than discerning " 'the intent of the Legislature so as to effectuate the purpose' " of each individual statute. (*Phelps* v. *Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) ▋ A narrow reading of the phrase "based on professional negligence" in this context is consistent with one of the primary purposes of section 15657—to protect elder adults through the application of heightened civil remedies from being recklessly neglected at the hands of their custodians, which includes the nursing homes or other health care facilities in which they reside.

### III. *Disposition*

For all of the foregoing, the judgment of the Court of appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.,** Concurring.—Although I agree with the result reached by the majority, I find the Court of Appeal's straightforward interpretation of Welfare and Institutions Code section 15657.2[1] more consistent with the statutory language while at the same time fully effectuating the Legislature's intent to provide additional remedies against abuse of elderly and dependent adults under the Elder Abuse and Dependent Adult Civil Protection Act (EADACPA) (§ 15600 et seq.).

In this case, we must determine the interplay of sections 15657 and 15657.2 of the act. Section 15657 authorizes the recovery of the decedent's pain and suffering damages in a wrongful death action as well as the award

---

[8]It is true that when a statutory term has received a definitive judicial construction, the Legislature is presumed to have intended that construction whenever it employs that term. (See *Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 608-609 [257 Cal.Rptr. 320, 770 P.2d 732].) But as discussed, *Central Pathology* did not purport to universally define the meaning of the term "based on professional negligence." Moreover, it is worth noting that *Central Pathology*, filed in 1992, *postdates* the 1991 amendments to the Elder Abuse Act found in Senate Bill No. 679. (1991-1992 Reg. Sess.) At the time Senate Bill No. 679 was enacted, the terms "arising out of professional negligence" and "based on professional negligence" had been quite narrowly construed. (See *Bommareddy* v. *Superior Court* (1990) 222 Cal.App.3d 1017, 1024 [272 Cal.Rptr. 246] [interpreting section 425.13(a) as excluding intentional torts]; *Flores* v. *Natividad Medical Center* (1987) 192 Cal.App.3d 1106, 1114-1116 [238 Cal.Rptr. 24] [interpreting the term "based on professional negligence" in MICRA to exclude "failure to summon" medical care pursuant to Government Code section 845.6].)

[1]Unspecified statutory references are to the Welfare and Institutions Code.

of attorney fees. Section 15657.2 states, "Notwithstanding this article [i.e., sections 15657 through 15657.3], any cause of action for injury or damage against a health care provider, as defined in Section 340.5 of the Code of Civil Procedure, based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."

The Court of Appeal concluded[2] "that while it could have been said more simply, section 15657.2 ensures application of [the California Medical Injury Compensation Reform Act of 1975 (MICRA)], but does not displace the enhanced remedies of EADACPA, when an action for elder abuse is 'based on the health care provider's alleged professional negligence.'" In reaching this conclusion, the court recognized that the language of section 15657.2 "indicates a legislative focus on statutes of specific application to this category of claims, such as those that comprise MICRA. For example, Civil Code section 3333.1, [abrogating the collateral source rule and] enacted as part of MICRA (see *Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 999 [35 Cal.Rptr.2d 685, 884 P.2d 142] (*Flowers*)), applies to 'an action for personal injury against a health care provider based upon professional negligence . . . .' (Civ. Code, § 3333.1, subd. (a).) Similarly, Civil Code section 3333.2, [limiting recovery of noneconomic damages and] also enacted as part of MICRA (see *Flowers, supra*, 8 Cal.4th at p. 999), applies to 'any action for injury against a health care provider based on professional negligence . . . .' (Civ. Code, § 3333.2, subd. (a).) Statutes like these, which specifically limit their application to actions against a health care provider based on professional negligence, are those statutes that section 15657.2 states 'shall . . . govern[].'

"The question, however, is whether section 15657.2 states that MICRA statutes shall *solely* govern or shall *also* govern. [Defendants] answer that the Legislature intended that MICRA alone should apply when the cause of action is based on the health care provider's alleged professional negligence. [Defendants'] argument implicitly assumes that the application of MICRA or EADACPA is an either-or proposition, but that both cannot apply in the same case. [The Court of Appeal] disagree[d] with this assumption. Section 15657 solely displaces statutes of *general* applicability, such as Code of Civil Procedure section 377.34, which limits the damages recoverable for a decedent's injuries or death, and Code of Civil Procedure section 1021, which limits the recovery of attorney fees. EADACPA's enhanced-remedy provisions do not conflict with any specific provision of MICRA."

---

[2]Brackets together, in this manner [], without enclosing material, are used herein to indicate deletions when quoting from the opinion of the Court of Appeal; brackets enclosing material (other than publisher's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this author.

The Court of Appeal also found no conflict between the provision for attorney fees in section 15657 and the provision in MICRA regulating the contingency fee that an attorney may contract for or collect in connection with an action "against a health care provider based upon such person's alleged professional negligence . . . ." (Bus. & Prof. Code, § 6146.) "This provision of MICRA, however, pertains to contingency fees only; it solely places 'limits on the percentage of a plaintiff's recovery that an attorney may retain when he represents the plaintiff on a contingency basis.' (*Roa* v. *Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 927, fn. 5 [211 Cal.Rptr. 77, 695 P.2d 164].) The award permitted by section 15657 does not provide for a contingency fee; it is not calculated solely as a percentage of the recovery and more importantly it does not come out of or reduce the plaintiff's award. An award of attorney fees under section 15657 is an additional liability imposed on the defendant. (See Code Civ. Proc., § 1033.5, subd. (a)(10)(B) [attorney fees authorized by statute are a form of recoverable costs].) [There is] no conflict between the provisions of MICRA and the enhanced remedy provisions of EADACPA. Thus, nothing precludes the joint application of [both]."

The majority "conclude[s] that this interpretation is not viable" because "[t]he word 'specifically' is not necessarily intended to convey the opposite of 'generally,' but, when read in context, can be taken to mean simply that the law applying to professional negligence alone governs professional negligence causes of action, and that section 15657 is not intended to alter this law." (Maj. opn., *ante*, at p. 29.)

At best, this reasoning is definitionally strained. (See Webster's New World Dict. (3d college ed. 1989) p. 1287 [as relevant here, "specific"—and by extension "specifically"—defined as "1 limiting or limited; specifying or specified; precise; definite; explicit [no *specific* plans] 2 of or constituting a species 3 peculiar to or characteristic of something [specific traits] 4 of a special, or particular, sort or kind"].) The majority's convoluted explanation that MICRA "implicitly incorporate[s] generally applicable statutes pertaining to civil actions" (maj. opn., *ante*, at p. 29) also provides no more analytical insight than the truism that the law is a "seamless web" (see *People* v. *Perez* (1979) 24 Cal.3d 133, 150 [155 Cal.Rptr. 176, 594 P.2d 1, 3 A.L.R.4th 339] (dis. opn. of Mosk, J.)) or that "[i]t is assumed that the Legislature has in mind existing laws when it passes a statute." (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].)

More importantly, as the Court of Appeal explained, "accepting [such an] interpretation of section 15657.2 would require [] ignor[ing] the Legislature's focus on MICRA. If the Legislature's intent was simply to displace

application of section 15657, reference to MICRA was unnecessary, particularly since the two statutes are not inconsistent." The court also noted "that the 'notwithstanding' language may additionally suggest that sections 15657 through 15657.3, which constitute 'this article,' will be subservient to 'those laws which specifically apply to those professional negligence causes of action.' In other words, to the extent 'those statutes specifically applicable to those professional negligence causes of action' conflict with the provisions of sections 15657 through 15657.3, the terms of the former statutes will control rather than the terms of the latter. []"

The Court of Appeal's interpretation also obviates the need to parse the distinction between "neglect" and "professional negligence." The majority aptly concedes this poses some "difficulty" at least in the case of certain health care institutions such as nursing homes (maj. opn., *ante*, at p. 34), since section 15610.57 refers to the "negligent failure" to render adequate care to an elderly or dependent adult and virtually every category of "neglect" set forth in the statute involves some form of professional negligence if committed by a health care provider. (E.g., § 15610.57, subd. (b)(1) ["[f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter"], (2) ["[f]ailure to provide medical care"], (3) ["[f]ailure to protect from health and safety hazards"], & (4) ["[f]ailure to prevent malnutrition or dehydration"].) Imposing a "recklessness" requirement does not transform the essential character of the underlying conduct from negligence.

The majority suggests the Court of Appeal's construction of section 15657.2 conflicts with the legislative history of EADACPA. (Maj. opn., *ante*, at pp. 29-30.) The Court of Appeal acknowledged "that the Legislative Counsel's Digest described 'this bill' [amending the statutory scheme to include the sections at issue here] as 'specify[ing] that actions against health care professionals for professional negligence shall be governed by laws specifically applicable to professional negligence actions, *rather than by these provisions.*' (Legis. Counsel's Dig., Sen. Bill No. 679 (Mar. 5, 1991) p. 2, italics added.) Albeit imprecise, this statement is not inconsistent with [the Court of Appeal's] interpretation []. The statement refers to 'professional negligence actions.' It cannot be disputed that pure negligence causes of action are not subject to section 15657. (See § 15657.) The enhanced remedies of that section arise only where the defendant has acted with recklessness, oppression, fraud or malice in the commission of the neglect. (§ 15657.)

"Moreover, this confusing description of the 1991 amendments in the Legislative Counsel's Digest is scant evidence of a legislative intent that section 15657.2 have the affect that [defendants] attribute to it. (Cf. *Isbister*

v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 87 [219 Cal.Rptr. 150, 707 P.2d 212] [finding confusing comment by Legislative Counsel was scant evidence of legislative intent].) ' "Although a legislative counsel's digest may be helpful in interpreting an ambiguous statute, it is not the law." . . .' (*In re Barry W.* (1993) 21 Cal.App.4th 358, 367 [26 Cal.Rptr.2d 161], citation omitted.) We will not disregard the problems that we find in interpreting the statute in the fashion advocated by [defendants] simply as a result of this (or similar) inconclusive and ambiguous comments in the legislative history. [Fn. omitted.] (See *J.A. Jones Construction Co.* v. *Superior Court* (1994) 27 Cal.App.4th 1568, 1578 [33 Cal.Rptr.2d 206] ['wisest course is to rely on legislative history only when that history itself is unambiguous'].)"

Although the court was responding to defendants' arguments regarding the significance of this legislative statement, its observations are equally apposite to the majority's criticism.

The Court of Appeal's interpretation has the further virtue of avoiding another foray into the *Central Pathology* thicket. (*Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181 [10 Cal.Rptr.2d 208, 832 P.2d 924].) The result in that case was undoubtedly correct with respect to Code of Civil Procedure section 425.13. As we are now seeing, however, the analysis is far from a suitable template for construing different statutory language enacted to address different concerns. Despite its extended discussion, the majority essentially determines nothing more than that "based on professional negligence" means whatever this court says at any particular moment. (See maj. opn., *ante*, at pp. 40, 41-42.) Under the Court of Appeal's analysis, it is unnecessary to address the meaning of this phrase here "because [] [defendants'] appeal fails even if the phrase [] includes [] a case alleging reckless neglect."

For the foregoing reasons, I would affirm the judgment but on the analytical basis set forth by the Court of Appeal.