Filed 5/24/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KATHLEEN A. WINN et al., | B237712 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC455808) |
| v. | |
| PIONEER MEDICAL GROUP, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Joanne B. O'Donnell, Judge. Reversed and remanded.

Magaña, Cathcart & McCarthy and Clay Robbins III for Plaintiffs and Appellants.

Balisok & Associates and Russell S. Balisok for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Cassidy C. Davenport; Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll, David P. Pruett and Jennifer A. Cooney for Defendants and Respondents.

Tucker Ellis, E. Todd Chayet and Rebecca A. Lefler for California Medical Association, California Dental Association, and California Hospital Association, as Amici Curiae on behalf of Defendants and Respondents.

_____

## SUMMARY

After the death of their 83-year-old mother, plaintiffs sued defendant physicians for elder abuse, based on defendants' repeated decisions not to refer their mother to a vascular specialist over a two-year period during which her diminishing vascular flow worsened without treatment. Plaintiffs' mother began receiving medical care from defendants in 2000, and by 2004, defendants knew she suffered from impaired lower vascular flow. In 2007, when she was under the sole medical care of the defendants, one of the defendant doctors diagnosed her with peripheral vascular disease. Defendants failed to refer plaintiffs' mother for specialized vascular care despite defendants' knowledge of her impaired lower vascular flow, their own diagnosis of peripheral vascular disease, the progressive deterioration over the two-year period of the vascular flow in her right leg, and their own notes of findings well known to be consistent with tissue damage due to vascular insufficiency. The day defendants last saw plaintiffs' mother, and noted abnormal weight loss, they again made no referral for a vascular consult. The next day, she was admitted to a hospital with a two-week history of gangrene.

Her "right foot was black due to tissue death caused by the long term impaired vascular flow Defendants had charted, and ignored, for years." Emergency vascular surgery was performed, without success, because of defendants' decisions that withheld needed medical care. A month later, plaintiffs' mother was re-admitted for a below-the-knee amputation of her right leg. Two months later, she underwent an above-the-knee amputation of her right leg. Seven months later, she was hospitalized with blood poisoning, and died.

Defendants contend they cannot be liable for elder abuse because they treated decedent as an outpatient, and liability for elder abuse "requires assumption of custodial obligations." They also contend the conduct plaintiffs allege constitutes only professional negligence and, as a matter of law, does not amount to the "reckless neglect" required for a claim of elder abuse.

2

Defendants are mistaken on both points.  The elder abuse statute does not limit liability to health care providers with custodial obligations, and the question whether defendants' conduct was reckless rather than merely negligent is for a jury to decide.  We therefore reverse the trial court's judgment dismissing plaintiffs' complaint.

## FACTS

The plaintiffs are Kathleen A. Winn and Karen Bredahl, the daughters and surviving heirs of Elizabeth M. Cox.  The defendants are Pioneer Medical Group, Inc., Emerico Csepanyi, James Chinuk Lee and Stanley Lowe.  Doctors Csepanyi, Lee and Lowe are licensed physicians or podiatrists, who maintained offices at Pioneer Medical Group in Cerritos and Long Beach.  Plaintiffs' first amended complaint alleges the following facts.

Mrs. Cox began receiving medical care from Dr. Csepanyi at Pioneer's facilities as early as November 2000.  In 2004, she was evaluated by Dr. Lowe, a podiatrist, who treated her for " 'painful onychomycosis,' " a condition "well known to limit mobility and indirectly impair peripheral circulation."  Dr. Lowe recorded that pulses in the upper surface of Mrs. Cox's foot "were not palpable reflecting [Mrs. Cox] had severely impaired vascular flow in her lower legs."  Dr. Lowe's 2004 report showed that a copy of the report was sent to Dr. Csepanyi.  Thus, both Dr. Lowe and Dr. Csepanyi knew that Mrs. Cox suffered from impaired lower vascular flow, and "also knew that if prompt referral to a vascular specialist was not made at that time there was a high degree of probability that [Mrs. Cox] would sustain serious injury because of her age and medical history."

Beginning in February 2007 and until March 2009, while Mrs. Cox was under their sole medical care, defendants "repeatedly made the conscious decision not to provide needed medical care to [Mrs. Cox] under circumstances where Defendants . . . knew that [Mrs. Cox] would be harmed by Defendants' failure to provide the medical care," and "were therefore reckless in their care of [Mrs. Cox]."

In January and February 2007, Mrs. Cox's "vascular issues regarding her lower extremities grew worse."  Defendants' records show Mrs. Cox "complained of ankle

3

edema, that her feet were discolored and evidenced 'decreased circulation.' " Dr. Csepanyi diagnosed her with peripheral vascular disease on February 13, 2007. "Although he knew [Mrs. Cox] had suffered from decreased vascular flow since 2004[,] that said condition was becoming worse without treatment over time, and that [Mrs. Cox] was at risk of severe injury as a result, he did not refer her for a vascular consult."

From February 2007 until April 2009, "Mrs. Cox's right leg vascular condition progressively deteriorated[,] as repeatedly noted by Defendants in [her] medical chart."

In December 2007, Dr. Lowe evaluated Mrs. Cox and "noted that the pulses in her lower legs and feet were further reduced, and recommended a follow-up in two months. Notwithstanding the deterioration of the vascular flow in the legs of [Mrs. Cox], Defendants decided not to make a referral to a vascular specialist."

In February 2008, Dr. Lowe noted Mrs. Cox's "vascular examination was 'unremarkable,' while also noting that she 'had an abscess of the lateral aspect of the right hallux nail plate and cellulitic [acute spreading bacterial infection below the surface of the skin] changes of the left hallux nail plate.' These findings are well known in the health care profession to be consistent with tissue damage due to vascular insufficiency. He merely drained the infection, prescribed medication, and suggested another follow-up in two months. He decided not to refer [Mrs. Cox] to a vascular specialist."

In July 2008, Dr. Csepanyi examined Mrs. Cox and confirmed she continued to suffer from peripheral vascular disease. Dr. Csepanyi saw Mrs. Cox again one month later but did not perform a vascular examination.

In December 2008, Dr. Lee evaluated Mrs. Cox, who had suffered a laceration on her right foot and right second toe. He cleaned the wound and recommended antibiotics. Mrs. Cox returned to Dr. Lee for follow-up in January 2009, as Dr. Lee had instructed. Mrs. Cox was "still complaining of pain and that her right big toe was not healing." Later in January 2009, Mrs. Cox returned again to see Dr. Csepanyi, complaining the wound had not healed and was painful. Dr. Csepanyi recommended medication and foot soaks. On February 9, 2009, he diagnosed cellulitis of the toes, cyanosis (skin turning blue/purple), and a toe abscess. The symptoms defendants noted in January and February

4

2009 "are evidence of cellular deterioration and tissue destruction due to peripheral vascular ischemia and, given the past medical history of [Mrs. Cox], the only appropriate care at that time (after cleaning the wound) would have been a referral to a vascular specialist, as [Mrs. Cox] was then at clear risk of serious injury due to progressive peripheral vascular insufficiency."

Mrs. Cox saw Dr. Lowe on February 10, 2009, and three other times in February and March 2009. On February 10, he "recognized that Ms. Cox suffered from chronic *non decubitus* (due to vascular compromise) ulcer of the toes, more clearly evidencing tissue destruction caused by vascular insufficiency." He recommended topical cream and a special shoe, but made no referral to a specialist. In the three subsequent visits, Dr. Lowe "continued to document her active problems of pain and non-healing foot wounds. During two of these visits, Dr. Lowe reported that he could not feel a pulse in her feet. These persistent symptoms are clear evidence of tissue deterioration due to peripheral vascular ischemia." Given Mrs. Cox's medical history, "Defendants' decision not to provide needed medical care clearly exposed [Mrs. Cox] to the immediate risk of serious injury due to her long standing and known condition of peripheral vascular insufficiency," depriving her of needed medical care under circumstances that he knew would expose [her] to harm.

On March 18, 2009, Mrs. Cox saw Dr. Csepanyi, who again acknowledged Mrs. Cox suffered from " 'chronic non decubitus ulcer of toes,' " a condition "well known in the medical field to be caused by the 'peripheral vascular disease' as he had previously noted (and continued to chart)." Though Dr. Csepanyi also saw Mrs. Cox had suffered from an abnormal weight loss, no follow-up plan was noted and no referral was made. "By these decisions Defendants again consciously deprived [Mrs. Cox] of needed medical care under circumstances where they knew [she] was certain to be harmed by the failure of Defendants to provide that care."

The next day, Mrs. Cox was admitted to a hospital "with symptoms consistent with a history of right lower extremity ischemia (inadequate blood supply to a local area due to blockage of the blood vessels) and a two-week history of right first toe gangrene.

5

Her right foot was black due to tissue death caused by the long term impaired vascular flow Defendants had charted, and ignored, for years.  She had lost 30 pounds from December 2008[.]  . . . [Her] foot was black because she had been suffering from sepsis (blood poisoning) due to the gangrene in her right foot."  A vascular surgery consultation occurred on an emergency basis; a revascularization procedure "was unsuccessful because of Defendants' decisions that withheld needed medical care."  In April, Mrs. Cox's right leg was amputated below the knee, and in June, Mrs. Cox had an above-the-knee amputation.  In January 2010 she was hospitalized with blood poisoning and died a few days later.

Plaintiffs filed a complaint for elder abuse on February 23, 2011.  Defendants' demurrer was sustained and plaintiffs filed a first amended complaint.  Plaintiffs alleged the conduct related above, and alleged defendants' "conscious failure to make . . . a vascular referral at any time" during the period between December 8, 2008 and March 3, 2009, constituted abuse or neglect as defined by the Elder Abuse and Dependent Adult Civil Protection Act (hereafter Elder Abuse Act or Act).[1]  "Defendants . . . repeatedly, for at least two years, failed to provide such needed medical care to [Mrs. Cox] under circumstances where Defendants . . . knew the health and well-being of [Mrs. Cox] depended on such care."  This failure "reflects a deliberate disregard for the high degree of probability that significant injury and certain suffering would befall [Mrs. Cox] as a result of Defendants' decisions" and "constitute[s] recklessness within the meaning of" the elder abuse statute.  Plaintiffs sought damages, costs, attorney fees, and punitive damages.

Defendants again demurred, and sought and obtained judicial notice of a complaint plaintiffs had filed for medical malpractice in March 2010.

The trial court sustained defendants' demurrer to the first amended complaint without leave to amend, concluding that plaintiffs "failed to provide facts showing that the defendants denied the decedent needed care in a reckless sense as is required for a

---

[1]     Welfare and Institutions Code section 15600 et seq.  All further statutory references are to the Welfare and Institutions Code unless otherwise identified.

violation of the Elder Abuse Act[.] . . . Instead, the allegations describe professional negligence and incompetence which, without malice, oppression, or fraud are insufficient to support a claim for neglect under the Elder Abuse Act."

The court ordered dismissal of the complaint and this appeal followed. We granted requests to file amicus curiae briefs by the California Medical Association, California Dental Association and California Hospital Association in support of defendants, and by California Advocates for Nursing Home Reform in support of plaintiffs.

## DISCUSSION

### 1. The Standard of Review

A demurrer tests the legal sufficiency of the complaint. We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. We also consider matters that may be judicially noticed. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

### 2. The Legal Background – The Elder Abuse Act

This case requires us to construe the Elder Abuse Act. Plaintiffs contend they have stated a claim under the Act, and defendants contend they have not, both because a defendant must have "custodial obligations" to be liable under the Act and because the allegations show only professional negligence, not neglect within the meaning of the Act. We do not read the Act or the cases construing it the way defendants and their amici contend it should be limited.

Section 15657 provides in relevant part: "Where it is proven by clear and convincing evidence that a defendant is liable for physical abuse . . . , or neglect . . . , or fiduciary abuse . . . [of an elderly or dependent adult], and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, the following shall apply, in addition to all other remedies otherwise provided by law: [¶] (a) The court shall award to the plaintiff reasonable attorney's fees and costs." (§ 15657, subd. (a).) In addition, the limitations of section 377.34 of the Code of Civil Procedure,

7

prohibiting a deceased plaintiff's estate from obtaining pain and suffering damages, do not apply, although the damages may not exceed those permitted under subdivision (b) of section 3333.2 of the Civil Code (limiting recovery of noneconomic losses to $250,000). (§ 15657, subd. (b).) To recover against an employer, the plaintiff must meet the standards set in section 3294 of the Civil Code for imposition of punitive damages on an employer based upon the acts of an employee. (§ 15657, subd. (c).)

Under the Elder Abuse Act, "neglect" is defined to include "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) Neglect "includes, but is not limited to," a number of failures listed in the statute, including "[f]ailure to provide medical care for physical and mental health needs" (§ 15610.57, subd. (b)(2)) and "[f]ailure to protect from health and safety hazards." (§ 15610.57, subd. (b)(3).)

The Elder Abuse Act excludes liability for acts of professional negligence. Section 15657.2 provides: "Notwithstanding this article, a cause of action for injury or damage against a health care provider, . . . based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action." (§ 15657.2.) "Those laws" include several statutes referred to as MICRA (Medical Injury Compensation Reform Act of 1975) that restrict causes of action and remedies for the professional negligence of health care providers, including notice provisions, caps on attorney contingency fees, and a $250,000 cap on noneconomic damages. (See *Delaney v. Baker* (1999) 20 Cal.4th 23, 28, fn. 2 (*Delaney*).) The Elder Abuse Act does not apply to simple or gross negligence by health care providers. (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 785 (*Covenant Care*).)

To obtain the enhanced remedies of section 15657, "a plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct." (*Delaney*, *supra*, 20 Cal.4th at p. 31.) " 'Recklessness' refers to a subjective state of

8

culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur [citations]. Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' [Citation.]" (*Id.* at pp. 31-32.)

Delaney, construing the Act's provisions on reckless conduct and professional negligence (§§ 15657 and 15657.2), concluded that " 'reckless neglect' under section 15657 is distinct from causes of action 'based on . . . professional negligence' within the meaning of section 15657.2." (*Delaney*, *supra*, 20 Cal.4th at p. 31.)  So, the court held, "a health care provider which engages in the 'reckless neglect' of an elder adult within the meaning of section 15657 will be subject to section 15657's heightened remedies." (*Id.* at p. 27.)  "Neglect" under the Act, the Supreme Court tells us, "refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.]  Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care.  [Citation.]" (*Covenant Care*, *supra*, 32 Cal.4th at p. 783, citing *Delaney*, *supra*, 20 Cal.4th at p. 34.)

3.     **The Contentions in This Case**

        a.  **The custodial obligation issue**

        Defendants assert that, to be liable under the Elder Abuse Act, a defendant "must have 'custodial obligations,' not merely provide care."  In other words, they say that *Delaney*'s holding—that health care providers who engage in reckless neglect are subject to the Elder Abuse Act—applies *only* to health care providers (such as skilled nursing facilities) that owe custodial obligations to an elder.  But that is contrary to the plain language of the statute, and to the language in *Delaney* holding that a health care provider that engages in the "reckless neglect" of an elder is subject to the Act's heightened remedies.  (*Delaney*, *supra*, 20 Cal.4th at p. 27.)

9

This very question was addressed in *Mack v. Soung* (2000) 80 Cal.App.4th 966 (*Mack*). In that case, the defendant physician claimed that he could not be liable under the Elder Abuse Act because he was not the decedent's "custodian or caretaker." (*Mack*, at p. 973.) Specifically, he contended the language in section 15610.57, subdivision (a)(1), referring to "any person having *the care or custody* of an elder" applied "only to institutional health care facilities and cannot apply to physicians such as himself, who merely treat elderly patients on an 'as needed' basis." (*Mack*, at p. 974.) *Mack* rejected the defendant's claim in no uncertain terms.

*Mack* explained: "The Act was expressly designed to protect elders and other dependent adults who 'may be subjected to abuse, neglect, or abandonment . . . .' (§ 15600, subd. (a).) Within the Act, two groups of persons who ordinarily assume responsibility for the 'care and custody' of the elderly are identified and defined: health practitioners and care custodians. A 'health practitioner' is defined in section 15610.37 as a '*physician* and surgeon, psychiatrist, psychologist, dentist, . . .' etc., who 'treats an elder . . . for any condition.' (Italics added.) 'Care custodians,' on the other hand, are administrators and employees of public and private institutions that provide 'care or services for elders or dependent adults,' including nursing homes, clinics, home health agencies, and similar facilities which house the elderly. (§ 15610.17.) The Legislature thus recognized that *both* classes of professionals—health practitioners as well as care custodians—should be charged with responsibility for the health, safety and welfare of elderly and dependent adults. This recognition is made explicit in the 'reporting' section of the Act which states that '[*a*]*ny person who has assumed full or intermittent responsibility for care or custody of an elder* or dependent adult, whether or not that person receives compensation, *including* . . . any elder or dependent adult care custodian, *health practitioner*, . . . is a mandated reporter.' (§ 15630, subd. (a), italics added.)" (*Mack*, *supra*, 80 Cal.App.4th at p. 974.)

*Mack* continued by pointing out that another section of the Act defining "abuse" imposes liability *only* on "care custodians." (*Mack*, *supra*, 80 Cal.App.4th at p. 974, citing § 15610.07, subd. (b).) Section 15610.07 defines abuse of an elder to include

"[t]he deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering." (§ 15610.07, subd. (b).) Unlike that section, the section "defining 'neglect' is not restricted to care custodians. Instead it applies generally to anyone having 'care or custody' of an elder, and specifically mentions the '[f]ailure to provide medical care for physical and mental health needs.' (§ 15610.57, subd. (b)(2).) Similarly, the heightened remedies section is not limited to care custodians but targets any 'defendant' who commits abuse or neglect and does so with 'recklessness, oppression, fraud, or malice.' (§ 15657.)" (*Mack*, at p. 974.)

We can see no flaw in *Mack*'s reasoning. The statutory language simply does not support defendants' contention that only "care custodians" are liable for elder abuse. (In any event, we find persuasive plaintiffs' argument that these defendants are, indeed, care custodians; the definition of "care custodian" in section 15610.17 includes "[c]linics" (§ 15610.17, subd. (b)), and these defendants provided medical care to Mrs. Cox at two of their clinics.)

Defendants insist that language in *Delaney* and *Covenant Care* shows that liability under the Act is limited to those with custodial obligations. We are not persuaded. The cases cited do indeed have language referring to custodial obligations. This is not surprising, since the cases involved claims against nursing homes or skilled nursing facilities, that is, defendants that, without question, owed custodial obligations to elders. *Delaney* found "the legislative history suggests that nursing homes and other health care providers were among the primary targets of the Elder Abuse Act" (*Delaney*, *supra*, 20 Cal.4th at p. 41), but *Delaney* and the other cases defendants cite do not support the broad proposition defendants assert, that the protection of the Elder Abuse Act was intended only for those in nursing homes, skilled nursing facilities, and the like.

When *Delaney* construed the term "professional negligence" as used in the Elder Abuse Act, it expressly rejected the view that any claim of neglect that is directly related to the professional services of a health care provider is necessarily based on professional negligence (and therefore not subject to enhanced remedies under the Elder Abuse Act). The position that health care providers who engage in reckless neglect are subject to the

11

Act, the court said, "is the one that most clearly follows the language and purpose of the statute." (*Delaney*, *supra*, 20 Cal.4th at pp. 30-31.) The court rejected a reading of the statute that "would broadly exempt from the heightened remedies of section 15657 health care providers who recklessly neglect elder and dependent adults." (*Id.* at p. 31.)

*Delaney* discussed the rationale for its conclusion at length. Among other things, *Delaney* explained that negligence "is commonly regarded as distinct from the reckless, malicious, oppressive or fraudulent conduct with which section 15657 is concerned" (*Delaney*, *supra*, 20 Cal.4th at p. 32); that the legislative history "indicates that those who enacted the statute thought that the term 'professional negligence,' at least within the meaning of section 15657.2, was mutually exclusive of the abuse and neglect specified in section 15657" (*id.* at p.30); and that the purpose of the Elder Abuse Act "is essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect." (*Delaney*, at p. 33.)

*Delaney* explained that some health care institutions "perform custodial functions *and* provide professional medical care" (*Delaney*, *supra*, 20 Cal.4th at p. 34), and an omission by nursing staff to prescribe or furnish sufficient nutrition may be professional negligence, but "is also unquestionably 'neglect,' as that term is defined" in the Elder Abuse Act. (*Delaney*, at pp. 34-35.) The "way out of this ambiguity" is that, "if the neglect is 'reckless[],' . . . then the action falls within the scope of section 15657 and as such cannot be considered simply 'based on . . . professional negligence[.]' . . . [T]he Elder Abuse Act's goal was to provide heightened remedies for . . . 'acts of egregious abuse' against elder and dependent adults [citation], while allowing acts of negligence in the rendition of medical services to elder and dependent adults to be governed by laws specifically applicable to such negligence. That only these egregious acts were intended to be sanctioned under section 15657 is further underscored by the fact that the statute requires liability to be proved by a heightened 'clear and convincing evidence' standard." (*Id.* at p. 35.)

*Delaney* further observed: "Regardless of what plaintiffs plead, they would not be entitled to the heightened remedies of section 15657 unless they proved statutory abuse

12

or neglect committed with recklessness, oppression, fraud or malice. Of course, the existence of such a remedy may increase the settlement value of the claim, but only to the extent that the facts indicate that defendant had committed reckless neglect, etc. Such increase in settlement value bolsters, rather than frustrates, the purpose of section 15657." (*Delaney*, *supra*, 20 Cal.4th at p. 41.) The court's reading of the Act was "consistent with one of the primary purposes of section 15657—to protect elder adults through the application of heightened civil remedies from being recklessly neglected at the hands of their custodians, which includes the nursing homes or other health care facilities in which they reside." (*Delaney*, at p. 42.)

Later cases, citing *Delaney*, have held that a MICRA or MICRA-related statutory provision does not apply to an elder abuse claim, even when brought against a health care provider. *Covenant Care* involved the question whether the procedural prerequisites for seeking punitive damages in an action arising out of the professional negligence of a health care provider (Code Civ. Proc., § 425.13) applied to punitive damages claims in elder abuse actions. (*Covenant Care*, *supra*, 32 Cal.4th at p. 776.) The answer was no; the Supreme Court found nothing in either Code of Civil Procedure section 425.13 or the Act "to suggest the Legislature intended to afford health care providers that act as elder custodians, and that egregiously abuse the elders in their custody, the special protections against exemplary damages they enjoy when accused of negligence in providing health care." (*Covenant Care*, at p. 776.)

*Covenant Care* said: "[O]ur conclusion that the Legislature intended the Elder Abuse Act to sanction only egregious acts of misconduct distinct from professional negligence contravenes any suggestion that, in defining 'elder abuse' to include failure to provide medical care, the Legislature intended that health care providers, alone among elder custodians, would enjoy under the Act the procedural protections they enjoy when sued for negligence in their professional health care practice." (*Covenant Care*, *supra*, 32 Cal.4th at p. 784.) "As we have noted, the Legislature apparently concluded that the high standard imposed by section 15657—clear and convincing evidence of (i) liability and (ii) recklessness, malice, oppression or fraud—adequately protects health care providers

13

from liability under the statute for acts of simple or even gross negligence." (*Id.* at p. 785.)

Thus, *Covenant Care* tells us, elder abuse, even when committed by a health care provider, "is not an injury that is 'directly related' to the provider's professional services. That statutory elder abuse may include the egregious withholding of medical care for physical and mental health needs is not determinative. As a failure to fulfill custodial duties owed by a custodian happens also to be a health care provider, such abuse is at most incidentally related to the provider's professional health care services." (*Covenant Care*, *supra*, 32 Cal.4th at p.786.) So, the court said, claims under the Elder Abuse Act "are not brought against health care providers in their capacity as providers but, rather, against custodians *and caregivers* that abuse elders and that may or may not, incidentally, also be health care providers." (*Covenant Care*, at p. 786, italics added.)

Defendants seize on the *Delaney* language, again cited in *Covenant Care*, that the purpose of the Elder Abuse Act is to protect the vulnerable elderly "from gross mistreatment in the form of abuse and custodial neglect[]" (*Delaney*, *supra*, 20 Cal.4th at p. 33) and that "neglect" under the Act refers to "the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations." (*Delaney*, at p. 34.) To be sure, both *Delaney* and *Covenant Care* refer to "custodial neglect" and "custodial obligations" and "failure to fulfill custodial duties." But in both cases the defendants were nursing facilities that both performed custodial functions and acted as health care providers, and neither case proposed to construe the Elder Abuse Act in any other context. Neither *Delaney* nor *Covenant Care* suggested that the Act does not apply to health care providers without custodial obligations. And, as we know, cases are not authority for questions not raised or addressed in those cases. (*Courtesy Ambulance Service v. Superior Court* (1992) 8 Cal.App.4th 1504, 1517, fn. 10 ["it is axiomatic that cases are not authority for points not raised and discussed"]; see *Covenant Care*, *supra*, 32 Cal.4th at p. 790, fn. 11 ["an unnecessarily broad holding is 'informed and limited by the fact[s]' of the case in which it is articulated"].)

14

Defendants also cite several Court of Appeal cases, quoting language referring to custodial obligations and claiming those cases acknowledge that liability under the Act requires custodial obligations. But those cases no more address the issue than did *Delaney* and *Covenant Care*. For example, *Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507 (*Smith*) held that the statute tolling the limitations period for an action based on a health care provider's professional negligence does not apply to a claim against a health care provider for elder abuse. (*Id.* at p. 1512.) The defendant was a skilled nursing facility. In its discussion, the court observed that under *Delaney*, "an elder abuse claim involves reckless neglect (or intentional abuse) by the custodian of an elder[,]" and thus "is simply not encompassed within 'professional negligence.' " (*Smith*, at p. 1522.) *Smith*, like the other cases defendants cite,[2] adds nothing to support defendants' claim, and indeed suggests the contrary. The Smith court, replying to the plaintiff's argument that an elder abuse claim "poses a unique risk of swallowing up a professional negligence claim and hence of nullifying MICRA"—and addressing the plaintiff's hypothetical of a surgeon who recklessly fails to wear a mask in the operating

[2]      In *Country Villa Claremont Healthcare Center, Inc. v. Superior Court* (2004) 120 Cal.App.4th 426, the plaintiffs alleged custodial care deficiencies by two defendant nursing facilities, and the court merely held, following *Covenant Care*, that Code of Civil Procedure section 425.13, subdivision (a) is inapplicable to punitive damage claims in actions where the gravamen of the claims is elder abuse. (*Country Villa Claremont*, at p. 429.) In the course of its discussion of elder abuse claims, the court observed that "[e]lder abuse claims are unique . . . because they are based on custodial neglect rather than professional negligence." (*Id.* at p. 432.) But the only authority cited for that proposition was the statute (§§ 15610.57 & 15657.2), and the statute clearly does not confine "neglect" to custodial neglect. Similarly, *Benun v. Superior Court* (2004) 123 Cal.App.4th 113 was a claim that a skilled nursing facility recklessly neglected to provide adequate custodial care. *Benun* held that the statute of limitations for actions against health care providers based on professional negligence is not the applicable statute of limitations in actions for elder abuse, relying on *Delaney* and *Covenant Care*. (*Benun*, at p. 123 ["*Delaney* makes clear that a cause of action for custodial elder abuse against a health care provider is a separate and distinct cause of action from one for professional negligence against a health care provider. It follows that egregious acts of elder abuse are not governed by laws applicable to negligence."].) *Benun* adds nothing to support defendants' claim that physicians without custodial obligations cannot be liable for elder abuse.

15

room and then sneezes into the elder patient's body cavity—said: "[W]e decline to be horrified by the possibility that the sternutatious surgeon could not invoke MICRA. . . . The Legislature could reasonably view this [the hypothetical] as egregious conduct." (*Id.* at pp. 1525, 1526.)

And so we return to the controlling authorities. The statutory language is clear: the Elder Abuse Act includes within its purview "any person having the care or custody of an elder" (§ 15610.57, subd. (a)(1).), and neglect includes "[f]ailure to provide medical care for physical and mental health needs" (§ 15610.57, subd. (b)(2)). *Delaney* itself held that "a health care provider which engages in the 'reckless neglect' of an elder adult within the meaning of section 15657 will be subject to section 15657's heightened remedies." (*Delaney*, *supra*, 20 Cal.4th at p. 27.) And the Court of Appeal in *Mack* expressly rejected the notion that the Elder Abuse Act "cannot apply to physicians . . . , who merely treat elderly patients on an 'as needed' basis." (*Mack*, *supra*, 80 Cal.App.4th at p. 974.) In short, we find no support in the statute or the cases for the claim that a health care provider without custodial obligations is exempt from the Elder Abuse Act.

### b. Plaintiffs' complaint sufficiently alleges reckless neglect

The trial court ruled, and defendants contend, that the conduct plaintiffs allege constitutes only professional negligence—that is, as a matter of law, the facts alleged in the complaint amount to a claim that the doctors' medical judgment may have been erroneous regarding whether Mrs. Cox needed a vascular consult, and do not amount to the "reckless neglect" required for a claim of elder abuse. But we cannot say that as a matter of law; the question is one for a jury to decide.

We will not repeat our description of the allegations in the complaint—but they include defendants' repeated failure, over a two-year period, to refer the decedent to a vascular specialist, despite their own diagnoses that demonstrated they knew, or should have known by a review of Mrs. Cox's medical file, that there was a strong probability of harm by the failure to provide the critically needed specialized care. Mrs. Cox's medical condition had deteriorated to the point that, the day after Dr. Csepanyi saw her for the last time and did nothing, she was hospitalized, with her foot black and gangrenous due to

16

tissue death caused by the long term impaired vascular flow defendants had charted, and ignored for years. While defendants characterize this as "simple negligence," we think a jury could reasonably find defendants' conduct "sufficiently egregious to constitute neglect" (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 407 (*Carter*)) within the meaning of the Act. (See *Covenant Care*, *supra*, 32 Cal.4th at p. 783 ["if the neglect (or other abuse) is reckless . . . , 'then the action falls within the scope of . . . section 15657 and as such cannot be considered simply "based on . . . professional negligence" ' "].)

Defendants rely on *Carter* to support their contention that the facts in the complaint show only professional negligence. *Carter* was an elder abuse action against a hospital that admitted and treated an elder for pneumonia and other conditions that developed while he was receiving care at a skilled nursing facility. The Court of Appeal affirmed the trial court's ruling sustaining the defendant's demurrer, concluding the plaintiffs did not allege conduct that qualified as elder abuse, as distinguished from negligence. (*Carter*, *supra*, 198 Cal.App.4th at p. 401.) The court found that the conduct alleged was not "sufficiently egregious to constitute neglect (or any other form of abuse) within the meaning of the Elder Abuse Act."**3** (*Id.* at p. 407.)

In *Carter*, the decedent was hospitalized three times. As to two of the hospitalizations, there were either no allegations of harmful conduct or no allegations of

---

**3** *Carter* "distill[ed] several factors that must be present for conduct to constitute neglect within the meaning of the Elder Abuse Act." (*Carter*, *supra*, 198 Cal.App.4th at p. 406.) "The plaintiff must allege (and ultimately prove by clear and convincing evidence) facts establishing that the defendant: (1) had responsibility for meeting the basic needs of the elder or dependent adult, such as nutrition, hydration, hygiene or medical care [citations]; (2) knew of conditions that made the elder or dependent adult unable to provide for his or her own basic needs [citations]; and (3) denied or withheld goods or services necessary to meet the elder or dependent adult's basic needs, either with knowledge that injury was substantially certain to befall the elder or dependent adult (if the plaintiff alleges oppression, fraud or malice) or with conscious disregard of the high probability of such injury (if the plaintiff alleges recklessness) [citations]." (*Id*. at pp. 406-407.)

17

causation.  (*Carter*, *supra*, 198 Cal.App.4th at pp. 407-408.)  On the third occasion, the plaintiffs alleged decedent died because the hospital did not administer the antibiotics he needed to treat his pneumonia, and did not have the proper size endotracheal tube in a crash cart, despite " 'false records' " to the contrary.  The court said:  "These allegations indicate the Hospital did not deny services to or withhold treatment from [decedent]—on the contrary, the staff actively undertook to provide treatment intended to save his life.  Although the failure to infuse the proper antibiotics and the failure to locate the proper size endotracheal tube in time to save [decedent's] life *might* constitute professional negligence . . . , absent specific factual allegations indicating at least recklessness (i.e., a conscious or deliberate disregard of a high probability of injury), neither failure constitutes abuse or neglect within the meaning of the Elder Abuse Act . . . ."  (*Id.* at p. 408, citations omitted.)

We do not see how *Carter*'s facts are in any way comparable to the facts the plaintiffs allege in this case.  Here, plaintiffs allege defendants withheld the only proper medical treatment and utterly disregarded the excessive risk to which they exposed Mrs. Cox for two years—circumstances quite different from those in *Carter.*  (See also *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 84, 90 (*Sababin*) [summary adjudication of dependent adult abuse claim on ground there was no evidence of anything more than professional negligence was reversed; "it is reasonably deducible that [nursing home's] employees neglected to follow the care plan by failing to check [the decedent's] skin condition on a daily basis and failing to notify a physician of the need for a treatment order"; failure to provide medical care and protect from health and safety hazards "shows deliberate disregard of the high degree of probability that she will suffer injury"].)

Defendants assert that plaintiffs must allege that "the health care provider completely and totally refused to provide any medical care."  But there is no authority for that proposition, and there is authority to the contrary.  In *Sababin*, the court rejected the claim that a care facility could not be held liable for dependent abuse unless there was a total absence of care.  (*Sababin*, *supra*, 144 Cal.App.4th at p. 90.)  "If some care is provided, that will not necessarily absolve a care facility of dependent abuse liability."

18

(*Ibid.*) Withholding of care occurs when a specific type of care is provided only sporadically, or when multiple types of care are required but only some of them are provided. (*Ibid.*) "In those cases, the trier of fact must determine whether there is a significant pattern of withholding portions or types of care. A significant pattern is one that involves repeated withholding of care and leads to the conclusion that the pattern was the result of choice or deliberate indifference." (*Ibid.*) We see no reason not to apply the same principle to a doctor's failure to provide medical care.

Finally, defendants point out repeatedly that plaintiffs also sued defendants for professional negligence. We see no relevance in that fact. As *Smith* observed, "it makes perfect sense to say that [the plaintiff's] elder abuse allegations altered the gravamen of what would otherwise have been professional negligence causes of action." (*Smith*, *supra*, 133 Cal.App.4th at p. 1525 ["Not every elder abuse action is brought against a health care provider, nor is every medical malpractice action brought by an elder who can allege reckless abuse or neglect. When a plaintiff happens to be able to assert both causes of action alternatively, each should still be subject to the same substantive and procedural rules as if it were asserted separately."].)

We do not find that professional negligence differs from elder abuse and neglect only in degree, or that there is a continuum of medical care, with professional negligence at one point on the continuum and reckless neglect at another. Rather, *Delaney* tells us that professional negligence, on the one hand, and abuse and neglect, on the other, are distinct and mutually exclusive. That does not mean it is anomalous to allege, as plaintiffs have, that the same facts may prove professional negligence and also elder abuse or neglect. This is no different from, say, a criminal act for which the law provides radically different consequences depending on the mens rea of the actor.

A jury may find the doctors' decisions to rely on their own nonspecialized opinions on the facts alleged here was unreasonable and constituted professional negligence. But the same jury may apply a fundamentally different paradigm—and they may do so only with clear and convincing evidence—that the doctors were culpable for an entirely different reason that is not directly related to the rendition of medical services.

19

The jury may view defendants' failure to refer Mrs. Cox to a vascular specialist as deliberate indifference to her increasingly urgent medical needs without regard for the excessive risk to which they exposed her by their failure to seek appropriate specialized care—that is, as an "egregious act[] of misconduct distinct from professional negligence" (*Covenant Care*, *supra*, 32 Cal.4th at p. 784).

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order sustaining defendants' demurrer without leave to amend, and to enter a new and different order overruling the demurrer. Plaintiffs shall recover their costs on appeal.

## CERTIFIED FOR PUBLICATION

GRIMES, J.

I CONCUR:

FLIER, J.

20

**Winn et al. v. Pioneer Medical Group, Inc. et al.**

**B237712**

**BIGELOW, P.J. Dissenting:**


I respectfully dissent.  I believe the majority has blurred the line between the Elder Abuse and Dependent Adult Civil Protection Act (the Act)[1] and professional negligence, despite the fact that the California Supreme Court has repeatedly noted the distinct and mutually exclusive nature of the two.

The majority extends liability under the Act in a manner that is unwarranted by the facts alleged in the case and prohibited by the Act itself.  Under section 15657.2 of the Act, "any cause of action for injury or damage against a health care provider . . . based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."  The allegations in this case fall squarely within the category of "professional negligence." I would therefore affirm the trial court order sustaining the demurrer.

As the majority acknowledges, the California Supreme Court has twice considered the differences between claims for elder abuse by a health care provider, and claims for professional negligence by a health care provider.  In *Delaney v. Baker* (1999) 20 Cal.4th 23 (*Delaney*) and *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771 (*Covenant Care*), the court distinguished neglect that qualifies for heightened remedies under section 15657, from the professional negligence referenced in section 15657.2, and from professional negligence as referenced in Code of Civil Procedure section 425.13, subdivision (a).  According to our high court, the conduct rendering a health care provider liable under section 15657 for neglect is of a wholly different nature from conduct constituting professional negligence.  Section 15657 neglect is "neglect

---

[1] Welfare and Institutions Code section 15600 et seq.  All further statutory references are to the Welfare and Institutions Code unless otherwise identified.

performed with some state of culpability greater than mere negligence" (*Delaney*, *supra*, 20 Cal.4th at p. 32); it is "'acts of egregious abuse' against elder and dependent adults" (*Id.* at p. 35); it is abuse that "is at most incidentally related to the provider's professional health care services." (*Covenant Care*, *supra*, 32 Cal.4th at p. 786.)

Of critical importance here is the *Delaney* court's conclusion that "those who enacted the statute thought that the term 'professional negligence,' at least within the meaning of section 15657.2, was mutually exclusive of the abuse and neglect specified in section 15657." (*Delaney, supra,* 20 Cal.4th at p. 30.) The court rejected the theory that a cause of action could be based on professional negligence within the meaning of section 15657.2 and also constitute reckless neglect within the meaning of section 15657. (*Id.* at p. 29.)

The *Delaney* court thus explained: "[N]eglect within the meaning of former section 15610.57 appears to cover an area of misconduct distinct from 'professional negligence' in section 15657.2: 'neglect' as defined in former section 15610.57 and used in section 15657 does not refer to the performance of medical services in a manner inferior to ' "the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing" ' [citation], but rather to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations. It is instructive that the statutory definition quoted above gives as an example of 'neglect' not negligence in the undertaking of medical services but the more fundamental '[f]ailure to *provide* medical care for physical and mental health needs.' (Former § 15610.57, subd. (b).)" (*Delaney*, *supra*, 20 Cal.4th at p. 34.)

Subsequently, in *Covenant Care*, the court relied on the *Delaney* analysis and added: "Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care. [Citation.]" (*Covenant Care, supra,* 32 Cal.4th at p. 783.) The court additionally explained that claims under the Act are not brought against health care providers in their capacity as providers. Instead, elder

2

abuse claims are properly brought against custodians and caregivers that abuse elders "and that may or may not, incidentally, also be health care providers." (*Id.* at p. 786.) In the *Covenant Care* analysis, elder abuse is "at most incidentally related" to a health care provider's professional health care services. (*Ibid.*)

In my view it is indisputable that plaintiffs' complaint concerns defendants' allegedly negligent undertaking of medical services, rather than a failure of those responsible for attending to Elizabeth M. Cox's basic needs and comforts to carry out their custodial or caregiving obligations. For example, according to the complaint, Dr. James Chinuk Lee's only involvement in Cox's care was to evaluate her once in 2008, and once in 2009. In 2008, Lee, a podiatrist, saw Cox to evaluate a laceration on her right foot and right second toe. Lee cleaned Cox's wound, made recommendations for antibiotics and wound care, and advised follow up as needed. He saw Cox one month later when she was still complaining of foot pain. Lee saw that Cox's right big toe was not healing. He diagnosed foot pain, and recommended medication, home treatment, and a follow up appointment. These were the complaint's only specific allegations as to Lee. Lee was only minimally involved in Cox's care, and for a brief period of time. These allegations, even if true, are not sufficient to render Lee's conduct in failing to recommend a vascular consult anything more than professional negligence. They concern Lee's negligence in the undertaking of medical services, not a "fundamental '[f]ailure to *provide* medical care for physical and mental health needs.'" (*Delaney*, *supra*, 20 Cal.4th at p. 34.)

Similarly, as to Dr. Stanley Lowe, plaintiffs allege he treated Cox for onychomycosis, recorded her pulses were not palpable, evaluated her in December 2007 and recommended a follow up, made notes on a vascular examination in February 2008, drained an infection and prescribed medication at that time, evaluated her in February 2009 and reported cellulitic changes to her toe, recommended a topical cream and use of a special shoe, and saw her in February and March 2009 and performed at least some examination of her foot. Plaintiffs allege that Dr. Emerico Csepanyi served as Cox's

3

physician beginning in at least 2004.  He diagnosed her condition, received reports, and kept notes on her condition.  Neither Lowe nor Csepanyi referred Cox to a vascular specialist, which plaintiffs allege was necessary for proper medical treatment.

These allegations, if proven, could establish negligence in the *undertaking* of medical services.  The majority rely on *Mack v. Soung* (2000) 80 Cal.App.4th 966 (*Mack*), to support their analysis, but the differences between *Mack* and this case are telling.  Defendants did not fail to provide medical care in the manner of the doctor in *Mack*, who, among other things, abruptly withdrew from his care of the patient, actively concealed her condition, and affirmatively opposed her hospitalization.  (*Mack*, at pp. 969-970.)  In contrast, here, while the doctors' alleged conduct in providing medical services may have been below the standard of care, it did not constitute an abandonment of obligations they owed Cox that were distinct from their duty as health care providers to provide adequate professional medical services.

Appellate cases following *Delaney* and *Covenant Care* also offer a slightly different way of thinking about the elder abuse/professional negligence distinction in cases involving a health care provider.  Some subsequent appellate cases navigating these waters have recognized the distinct nature of elder abuse, then considered the "gravamen" of the claim to determine whether the Act applies, or the laws governing professional negligence of a health care provider.  (See *Country Villa Claremont Healthcare Center, Inc. v. Superior Court* (2004) 120 Cal.App.4th 426, 429, 434-435; *Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1525.)  In my view it is clear the gravamen of plaintiffs' claim is professional negligence.  The only thing that distinguishes this case from a standard medical malpractice claim is that Cox was over 65 years old.  If we ask what makes up the heart of this case, I believe the only answer supported by the allegations in the complaint is this: the case is about doctors using disastrously bad professional judgment.  But their conduct was of a different nature than what one finds in cases where the court concluded the claim against a health care provider could constitute elder abuse.

4

Here, Cox visited the defendant physicians only on an outpatient basis. The complaint does not allege Cox was in any way inhibited from seeking a second opinion from another doctor at any point in her treatment. She was not an elder in a nursing home or an elder with diminished cognitive abilities. (See e.g., *Mack, supra,* 80 Cal.App.4th at p. 969 [decedent was resident in nursing and rehabilitation facility, had deteriorating mental faculties]; *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 85 [dependent adult had disorder that caused loss of cognitive and mental functions; neglected in rehabilitation facility]; *Benun v. Superior Court* (2004) 123 Cal.App.4th 113, 116 [blind nursing home resident suffered from Alzheimer's disease].) There is no allegation that defendants' conduct was intentional or fraudulent. (See e.g., *Mack,* at p. 969 [doctor concealed decedent's injury and opposed hospitalization]; *Smith v. Ben Bennett, Inc., supra,* 133 Cal.App.4th at p. 1512 [decedent was abused, beaten, denied medical treatment in skilled nursing facility]; *Benun,* at p. 116 [nursing home used physical and chemical restraints and medication to prevent decedent from obtaining help].) There was no complete failure to treat her condition. (See e.g., *Mack,* at p. 970 [doctor abruptly withdrew from decedent's care, refused to permit her hospitalization].)

The absence of any one of these allegations is not determinative, but that *none* of them are included in plaintiffs' complaint indicates to me that the gravamen of their claim is professional negligence, not elder abuse. (See *Carter v. Prime Healthcare Paradise Valley* LLC (2011) 198 Cal.App.4th 396, 406-407 (*Carter*) [distilling several factors from other cases that render conduct neglect under the Act].) Despite plaintiffs' remarkably careful pleading, it remains clear the theory advanced in the complaint is that defendants did not do the *right* thing to treat Cox's condition, as judged by medical standards. This is classic professional negligence. (*Carter, supra,* 198 Cal.App.4th at p. 408 [hospital failure to administer antibiotics to treat pneumonia and failure to have proper equipment was not elder abuse]; *Delaney, supra*, 20 Cal.4th at p. 34 [neglect in section 15657 "does not refer to the performance of medical services in a manner inferior

5

to ' "the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing[.]"' [Citation]". )

According to the California Supreme Court, elder abuse by a health care provider is not the same as even gross professional negligence.**2** (*Covenant Care, supra*, 32 Cal.4th at p. 785.) No allegations in plaintiffs' complaint transform their claim from professional negligence into egregious conduct only *incidental* to the defendants' professional health care services. The gravamen of plaintiffs' claim is professional negligence in the undertaking of medical services, not the egregious, reckless failure to meet the custodial or caregiver obligations imposed by the Act.

Of course this case is particularly difficult because plaintiffs do not allege defendants had any custodial obligations. As I read *Delaney* and *Covenant Care,* the California Supreme Court distinguished "reckless neglect" under section 15657 from "professional negligence" under section 15657.2 and Code of Civil Procedure section 425.13, not only based on the egregiousness of the conduct, but also based on the differing character of custodial duties versus the performance of medical services alone. (See e.g., *Delaney*, *supra*, 20 Cal.4th at pp. 34-35, 41, 42; *Covenant Care*, *supra,* 32 Cal.4th at pp. 783-786.) The idea that those providing medical care to elders or dependent adults in custodial settings have dual, overlapping responsibilities, was central to the court's analysis in both cases.

For example, in *Delaney*, the court noted that "[t]he difficulty in distinguishing between 'neglect' and 'professional negligence' lies in the fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional

---

**2**     I agree with the court in *Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, and similar cases, in concluding the Act creates an independent cause of action with attendant heightened remedies. Certainly with respect to health care providers, section 15657 is not simply a special remedies allegation that can be tacked on to what would otherwise be a professional negligence claim. Because of section 15657.2, and consistent with our high court's explanation of section 15657 as applied to health care providers, a cause of action for neglect against a health care provider must be understood as something other than professional negligence with heightened remedies.

6

medical care." (*Delaney, supra*, 20 Cal.4th at p. 34.) The implication is that a defendant providing *only* professional medical care would fall into the professional negligence category, rather than neglect under the Act. The court rejected the argument that section 15657.2 applied to *any* action directly related to the professional services provided by a health care provider because such an approach would "make the determination as to whether the 'recklessly neglectful' custodians of an elderly person were subject to section 15657 turn on the custodian's licensing status: A custodian who allowed an elder or dependent adult in his or her care to become malnourished would be subject to 15657's heightened remedies only if he or she was *not* a licensed health care professional." (*Delaney*, at p. 35.) In other words, even licensed health care professionals are liable under section 15657 for egregious conduct in failing to carry out their *custodial* duties. (*Id.* at p. 34.)

And, as indicated above, in *Covenant Care,* the court explained: "That statutory elder abuse may include the egregious withholding of medical care for physical and mental health needs is not determinative. As a failure to fulfill custodial duties owed by a custodian that happens also to be a health care provider, [elder abuse as defined in the Act] is at most incidentally related to the provider's professional health care services. [¶] That is, claims under the Elder Abuse Act are not brought against health care providers in their capacity as providers but, rather, against custodians and caregivers that abuse elders and that may or may not, incidentally, also be health care providers. Statutorily, as well as in common parlance, the function of a health care provider is distinct from that of an elder custodian, and 'the fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional medical care' (*Delaney, supra,* 20 Cal.4th at p. 34; italics added) does not mean that the two functions are the same." (*Covenant Care*, *supra*, 32 Cal.4th at p. 786.) In both cases, the court supported its analysis with references to the Legislature's intent to protect elders and dependent adults in custodial settings, and to eliminate institutional abuse. (*Delaney*, at pp. 33, 36-37; *Covenant Care*, at p. 787.)

7

The court's references to custodial functions and obligations were not merely incidental; they were a key part of the court's reasoning. I acknowledge that the Supreme Court's analysis in *Delaney* includes significant discussion of the "reckless," near-intentional nature of neglect under the Act, and its difference from "professional negligence." I further acknowledge that this analysis theoretically may be applied regardless of whether the defendant has custodial duties. (*Delaney, supra,* 20 Cal.4th at pp. 35, 40-41; see also *Covenant Care*, *supra*, 32 Cal.4th at p. 786.) But, when taken out of the context of custodial settings, I believe the line between "reckless neglect" and "professional negligence" risks becoming blurred to the point of extinction.[3] This result is clearly not what our high court intended, since in *Delaney*, the court concluded elder abuse and professional negligence under section 15657.2 are mutually exclusive.

Given that section 15610.57, subdivision (a)(1) plainly states any person having the care *or* custody of an elder may be responsible for neglect, I cannot accept defendants' argument that only health care providers with *custody* of an elder are subject to section 15657 liability. But I can only harmonize section 15657.2, and *Delaney* and *Covenant Care*, by focusing on the overlapping duties of caregiver/custodian and health care provider, and analyzing the allegations in the complaint to determine which duties plaintiffs allege were breached. Considering the egregiousness of the alleged conduct alone does not recognize that elder abuse and professional negligence are mutually exclusive claims.

Even without defining exactly what caregiving duties a physician may owe an elder which are distinct from simply rendering medical services, I do not think it can be

---

[3]     Even in *Mack*, the defendant physician attended to an elderly patient while she was living at a nursing and rehabilitation center. (*Mack*, *supra*, 80 Cal.App.4th at p. 969.) In my view, that there are no published legal authorities addressing the liability of a health care practitioner under the Act when he or she is providing only outpatient care to an elder or dependent adult in a non-custodial or non-residential setting, is consistent with a general understanding in the legal community that section 15657 only applies when the defendant has direct or indirect custodial responsibilities for a patient protected by the Act.

said that in this case, plaintiffs' claims are brought against defendants in their capacity as "custodians and caregivers that abuse elders" who are "incidentally health care providers," rather than as claims brought against them in their capacity as health care providers.  (*Covenant Care*, *supra*, 32 Cal.4th at p. 786.)  There are no allegations identifying any obligations defendants had to Cox that were distinct from the provision of professional medical care.  Despite the indisputably tragic *outcome* of defendants' conduct, I conclude the gravamen of plaintiffs' claim is one of professional negligence, not elder abuse.  As such, under section 15657.2, plaintiffs' claim should be governed by the applicable laws of professional negligence.  I therefore respectfully dissent.


BIGELOW, P.J.

9