Filed 6/28/21  Brodkin v. St. Joseph Hospital of Orange CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FRANCINE BRODKIN, | |
| Plaintiff and Appellant, | G058192 |
| v. | (Super. Ct. No. 30-2017-00908376) |
| ST. JOSEPH HOSPITAL OF ORANGE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from orders of the Superior Court of Orange County, Sheila Fell, Judge.  Affirmed in part and reversed in part with directions.

Law Office of Martin N. Buchanan and Martin N. Buchanan; Michael F. Moran and Lisa T. Flint for Plaintiff and Appellant.

Carroll, Kelly, Trotter & Franzen and David P. Pruett; Clyde & Co. and Margaret M. Holm for Defendants and Appellants.

## INTRODUCTION

Francine Brodkin has appealed from an order granting a new trial on her successful claims against St. Joseph Hospital of Orange for professional negligence and elder abuse. Both parties moved for a new trial. The trial court granted St. Joseph's motion for an entirely new trial; Brodkin asserts on appeal that the new trial should be limited to damages only. St. Joseph has cross-appealed, asserting that the trial court should have granted its motion for nonsuit on Brodkin's elder abuse cause of action.

We affirm the trial court's order denying St. Joseph's motion for nonsuit. We cannot say the court abused its discretion in determining that Brodkin's elder abuse evidence, if believed, was sufficient to avoid a judgment for St. Joseph as a matter of law. The new trial orders are both reversed. The trial court should have granted a limited trial on damages only. Accordingly, the order granting St. Joseph's new trial motion is reversed, as is the order denying Brodkin's new trial motion. Brodkin's motion for a new trial limited to damages only must be granted.

## FACTS[1]

Sixty-five-year-old Francine Brodkin and her husband provided most of the testimony about her experience at St. Joseph in August 2016. She herself did not remember much about the first part of her stay.

Brodkin went to the St. Joseph emergency room with her husband and son at about 7:30 a.m. on August 25, 2016. She suffered from anxiety, and her psychiatrist recommended admission to the hospital's behavioral unit. She was given an IV and several medications in the ER, and testified she could not remember anything between 2:00 p.m. on the day she was admitted and the early morning of the next day.

Brodkin's husband filled in the blanks. He stated the family members were in the ER for five to six hours before Brodkin was admitted to the behavioral unit.

---

[1] Because we are reviewing an order denying a motion for a nonsuit, we recite only the evidence in favor of the plaintiff's case. (See *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117-118.)

2

During that time, she was given three medications. The third one made her "[fall] back on that gurney, and her eyes were closing, and she became very lethargic and very limp. She was just almost completely knocked out at that point."

Brodkin went to the behavioral unit floor at 2:00 p.m., accompanied by her husband and son. At this point, she was in a wheelchair and "out of it." Her husband had to sign the admitting papers for her. The hospital psychiatrist tried to evaluate her at about 5:00, but was unable to do so; she was slumping in her wheelchair and was still "really out of it." Her husband had to recount her medical history. He left at about 6:00 p.m., having been told by the nurses that they needed to get Brodkin settled in her room.

At about 8:15 that night, Brodkin phoned her husband and told him she was still in her wheelchair and did not yet have a bed in a room. Her husband spoke to a nurse, who told him they were "still working on it." Brodkin called her husband at 7:11 the next morning (August 26) to tell him "she was put on this old couch in this darkened room." She told him she fell off the couch, and she thought she had broken her arm or shoulder. She called him again about an hour later to say she was in pain and had asked for X-rays. Her husband spoke to a nurse, who told him X-rays had been ordered. At 11:00 a.m., Brodkin called her husband to tell him she had still not been taken to have X-rays. Fifteen minutes later, she called again to say she will still sitting in the hall, in pain, waiting for an X-ray. And again at 12:30 p.m. She finally had an X-ray during the early afternoon, confirming that she had fractured her shoulder.[2]

When Brodkin's husband arrived for visiting hours in the late afternoon of August 26, he found her lying in a bulky geri chair (a hospital recliner that can be wheeled about) in the hall. When he came to visit the following day, again late in the afternoon, she was again lying in a geri chair in the hall in the same spot. She was also wearing the same clothes she had worn when she was admitted two days earlier and was

---

[2] The order for the X-ray was a "stat" order, that is, one that was to be filled within an hour. Brodkin received her X-ray seven hours after the order was given.

again "so medicated that she could barely open her eyes." Her husband asked the nurses to bathe her and change her clothes.

Brodkin was discharged on the morning of August 29. By that time her husband had asked several nurses how she had come to fracture her shoulder. No one knew.

Brodkin testified that she remembered rolling off a couch onto the floor early in the morning of the second day, hurting her shoulder. She was in what looked to her like a storage room. She walked out into the hallway to ask for help. The nurses did nothing. She repeatedly asked for an X-ray, but one was not taken until the afternoon. In the meantime, she sat in the geri chair in the hall. She also testified that she had no memory of *ever* being placed in a hospital bed during the entire time of her stay.

It is undisputed that St. Joseph classified Brodkin as being at a high risk to fall when she was admitted to the behavioral unit because of dizziness and unsteady balance. A high risk classification meant she had to be monitored continuously. It is also undisputed that none of the staff saw Brodkin fall or could explain how it happened.

Brodkin sued St. Joseph for elder abuse and professional negligence in 2017. The case was tried to a jury in February and March 2019. At the close of Brodkin's evidence, St. Joseph moved for a nonsuit on her elder abuse claim, arguing that the evidence did not support the elements of such a claim, which were different from and more demanding than those of professional negligence. The court denied the motion.

The jury returned a special verdict in Brodkin's favor on both elder abuse and negligence.

4

A problem arose with the jury's award of damages. Although the jurors had been instructed that they could not award the same damages twice,[3] the jury awarded Brodkin $287,500 for past non-economic loss (physical pain, mental suffering, loss of enjoyment of life, physical impairment, grief, anxiety, humiliation, and emotional distress) on the negligence count and $112,500 for past non-economic loss (same elements) on the elder abuse neglect count. The jury awarded the same amounts ($287,500 and $112,500 respectively) for future non-economic loss on each count on the same elements.[4]

At a subsequent hearing, the trial court ordered Brodkin to elect her remedies.[5] Brodkin chose the elder abuse remedy.

Both Brodkin and St. Joseph moved for a new trial. The difference was that Brodkin wanted the new trial limited to damages, while St. Joseph moved for an entirely new trial. The court granted St. Joseph's motion. The court reasoned that the special verdict did not clearly instruct the jury about how to avoid duplicate damages for elder abuse and negligence and could have confused the jury.

Brodkin has appealed from the order granting an entirely new trial. St. Joseph has cross-appealed on the ground that the trial court should have granted its motion for nonsuit on the elder abuse claim.

---

[3] The jury instruction stated, ". . . Brodkin seeks damages from [St. Joseph] under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged. [¶] You will be asked to decide whether [St. Joseph] is liable to . . . Brodkin under the following legal theories: [¶] 1. Elder Abuse [¶] 2. Negligence[.] [¶] The following items of damages are recoverable only once under all of the above legal theories: [¶] 1. Past medical expenses [¶] 2. Physical pain, mental suffering, loss of enjoyment of life, physical impairment, grief, anxiety, humiliation, and emotional distress."

[4] The jury also awarded $7,288 for economic loss (past medical expenses) on the negligence count and $0 for past medical expenses on the elder abuse count.

[5] Brodkin argued the amounts were cumulative, so she did not have to elect. The court disagreed.

## DISCUSSION

### I. Nonsuit[6]

"A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case. Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. [Citation.] A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. [Citations.] [¶] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in [plaintiff's] favor . . . .'" [Citations.]" (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 (*Carson*).)

"In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required *as a matter of law*.' [Citations.] [¶] Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation,

---

[6] Brodkin argues the order denying St. Joseph's motion for nonsuit it not appealable, since there is no final judgment after a new trial has been granted. Therefore we should dismiss the cross-appeal.

Code of Civil Procedure section 906 permits us, upon an appeal pursuant to section 904.1, to review "any intermediate ruling" that "involves the merits" or that "substantially affects the rights of a party," without the necessity of a cross-appeal. Even if we dismissed the cross-appeal, we could still review the order denying the nonsuit motion, since the appeal is pursuant to Code of Civil Procedure section 904.1, subdivision (a)(4), and the nonsuit order "involves the merits" and "substantially affects" St. Joseph's rights. If the court should have granted the motion for nonsuit, a new trial motion would be very different from the one upon which this appeal is based and might not be necessary at all.

suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.] Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit. [Citations.]" (*Carson*, *supra*, 36 Cal.3d at p. 839, italics added.)

Brodkin sued St. Joseph on two theories: negligence and elder abuse. St. Joseph argues that (1) the two theories are mutually exclusive and (2) it was entitled to a nonsuit on the elder abuse theory at the close of Brodkin's evidence because there was no evidence of conduct other than professional negligence, of recklessness, and of a custodial relationship. In addition, Brodkin had failed to meet the "clear and convincing" standard required for recovery under the Elder Abuse Act and had failed to present evidence satisfying the requirements of Civil Code section 3294, subdivision (b),[7] which must happen before damages and attorney fees may be imposed against an employer. (See Welf. & Inst. Code, §15657, subd. (c).)[8]

Sections 15600 et seq., the Elder Abuse Act, was enacted to protect the elderly from abuse, neglect, and abandonment. (§ 15600, subd. (a).) An "elder" is a California resident who is 65 or older. (§ 15610.27.) Section 15610.57, subdivision (a) defines "neglect" as "(1) The negligent failure of any person having the *care or custody* of an elder . . . to exercise that degree of care that a reasonable person in a like position would exercise. [¶] (2) The negligent failure of an elder . . . to exercise that degree of self care that a reasonable person in a like position would exercise." (Italics added.)

---

[7] Civil Code section 3294, subdivision (b), provides, "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

[8] All further statutory references are to the Welfare and Institutions Code, except where otherwise indicated.

7

Subdivision (b) provides, in pertinent part, "Neglect includes, but is not limited to, all of the following: [¶] (1) Failure to assist in personal hygiene, or in the provision of food, clothing, or shelter. [¶] (2) Failure to provide medical care for physical and mental health needs. . . . [¶] (3) Failure to protect from health and safety hazards. [¶] (4) Failure to prevent malnutrition or dehydration."

The Elder Abuse Act provides enhanced remedies in the form of, first, predeath pain and suffering damages (§ 15657, subd. (b)) and, second, reasonable attorney fees and costs. (§ 15657, subd. (a). ) The catch is that the plaintiff must prove a violation by "clear and convincing evidence," instead of the preponderance standard for negligence. In addition, the plaintiff must prove "recklessness, oppression, fraud, or malice in the commission of this abuse[.]" (§ 15657.)

Section 15657.2 provides, "Notwithstanding this article, any cause of action for injury or damage against a health care provider, as defined in Section 340.5 of the Code of Civil Procedure, based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."

In its motion for nonsuit, St. Joseph argued, in effect, that Brodkin's evidence, if believed, established only professional negligence, but did not meet the heightened proof requirements (recklessness, clear and convincing evidence) for elder abuse liability. It also argued that St. Joseph did not have the custodial relationship with Brodkin necessary to support an elder abuse claim and that Brodkin has presented no evidence of the advance knowledge, authorization, or ratification required under section 15657, subdivision (c), to permit her to recover damages from a corporate employer.

Where to draw the line between a health care provider's professional negligence and elder-abuse neglect has been the subject of several opinions of our Supreme Court. The court in *Delaney v. Baker* (1999) 20 Cal.4th 23 (*Delaney*) explained that "'neglect' . . . does not refer to the performance of medical services in a manner

8

inferior to "'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing'" [citation], but rather to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations." (*Id.* at p. 34.) In *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 786 (*Covenant Care*), the court stated, "[C]laims under the Elder Abuse Act are not brought against health care providers in their capacity as providers but, rather, against custodians and caregivers that abuse elders and that may or may not, incidentally, also be health care providers."

The *Delaney* court also touched on what has become the central issue in this case: "The difficulty in distinguishing between 'neglect' and 'professional negligence' lies in the fact that some health care institutions, such as nursing homes, perform custodial functions *and* provide professional medical care. When, for example, a nursing home allows a patient to suffer malnutrition, defendants appear to argue that this was 'professional negligence,' the inability of nursing staff to prescribe or execute a plan of furnishing sufficient nutrition to someone too infirm to attend to that need herself. But such omission is also unquestionably 'neglect' . . . ." (*Delaney, supra*, 20 Cal.4th at pp. 34-35.)

More recently, the court in *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148 (*Winn*) addressed the relationship necessary to establish an elder abuse claim. The elder in *Winn* was an outpatient who developed gangrene and eventually died from sepsis owing to the failure of health care providers to refer her to a specialist after she repeatedly presented with symptoms of compromised blood circulation to her lower legs. (*Id.* at pp. 153-154.)

The *Winn* analysis concentrated on the meaning of "care or custody" in the definition "neglect" in the Elder Abuse Act. (§ 15610.57, subd. (a).) The court concluded that the definition contemplated "a robust caretaking or custodial relationship

9

– that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn, supra,* 63 Cal.4th at p. 158.) "Ultimately, the focus of the statutory language is on the nature and substance of the relationship between an individual and an elder or a dependent adult. This focus supports the conclusion that the distinctive relationship contemplated by the Act entails more than casual or limited interactions." (*Ibid.*) "The statutory scheme further persuades us that the concept of neglect – though broad enough to encompass settings beyond residential care facilities – is not intended to apply to any conceivable negligent conduct that might adversely impact an elder or dependent adult. Instead, neglect requires a caretaking or custodial relationship that arises where an elder or dependent adult depends on another for the provision of some or all of his or her fundamental needs." (*Id.* at p. 160.)

In this case, granting a motion for a nonsuit would require the trial court to conclude that interpreting the evidence most favorably to Brodkin's case and most strongly against St. Joseph and resolving all presumptions, inferences, and doubts in favor of Brodkin, a judgment for St. Joseph is required as a matter of law. (See *Carson*, *supra*, 36 Cal.3d at p. 839.) We agree with the trial court that if a jury favorably interprets Brodkin's evidence, it could find that St. Joseph had a custodial relationship with her, in addition to a professional one, and had acted recklessly.

According to her evidence, Brodkin was so heavily sedated in the ER that she was in a stupor, unable even to sit up in a wheelchair. She would therefore have been utterly dependent on the behavioral unit staff, unlike a fully competent adult. The staff identified her as being at high risk for a fall, probably because of these powerful drugs, and therefore in need of constant monitoring. This watchfulness did not appear to require a high level of professional skill, just someone paying attention. Yet Brodkin was unquestionably unattended, and she unquestionably fell, hard enough to fracture her

10

shoulder. When coupled with the (disputed) evidence that she was housed on a sofa in a storage room and left lying in the hall unbathed for two days in a geri-chair – arguably custodial acts – and that her "stat" order for an X-ray of her fractured shoulder took seven hours to complete, while she waited in pain,[9] a jury could find that (1) Brodkin had met the recklessness requirement for an elder abuse claim and (2) St. Joseph had the necessary custodial relationship. We certainly cannot say a jury could not, as a matter of law, reach these conclusions.

As for satisfying the requirements of Civil Code section 3294, subdivision (b), for imposition of attorney fees and damages on a corporate employer, we believe St. Joseph is interpreting the "officer, director, or managing agent" language too narrowly. The code section does not require that a corporate officer or a board of directors member personally oversee Brodkin's treatment or that such a person signed off on Brodkin's care after the fact. (See *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 453-454.)

Circumstantial evidence may establish authorization or ratification. (See *Pusateri v. E.F. Hutton & Co.* (1986) 180 Cal.App.3d 247, 255.) Failure to investigate or take remedial measures can also be circumstantial evidence of ratification. (See *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 726.) There was evidence of both from Brodkin's witnesses, which, if the jury believed it, would support the imposition of damages on St. Joseph as an employer.

In fact, the jury later found that Brodkin had proved by clear and convincing evidence that the acts constituting elder abuse (1) were committed by an officer, director, or managing agent, (2) were authorized by an officer, director, or managing agent, or (3) were known and adopted or approved by an officer, director, or managing agent.

---

[9] "Neglect" includes "egregious *withholding* of medical care[.]" "As a failure to fulfill custodial duties owed by a custodian who happens also to be a health care provider, such abuse is at most incidentally related to the provider's professional health care services." (*Covenant Care, supra,* 32 Cal.4th at p. 786, italics added.)

11

St. Joseph argues that professional negligence and elder abuse neglect are mutually exclusive. Therefore Brodkin could not sue for both.

It is true that the two theories are mutually exclusive, and therefore the same conduct cannot be both professional negligence *and* elder-abuse neglect. But that simply means a health care provider cannot be liable for both negligence and elder abuse for the same acts. It does not mean the plaintiff cannot sue for both or try to prove both at trial. St. Joseph's theory would require a plaintiff to sue for elder abuse and then, if unsuccessful, sue again for professional negligence. Yet some conduct by a health care provider could be professional negligence, while other conduct is elder-abuse neglect. And, as the *Delaney* court pointed out, allowing a nursing home patient to suffer from malnutrition is professional negligence, but it could also be elder-abuse neglect. (*Delaney, supra,* 20 Cal.4th at p. 35.) The plaintiff would have to prove recklessness by clear and convincing evidence to establish elder abuse, but the underlying conduct would be the same in both instances. By way of contrast, a bad treatment choice might be professional negligence but would seldom involve elder-abuse neglect.

## II.     New Trial

The parties agree that the jury did not follow instructions when it came to awarding damages. They also agree that a new trial is warranted. They disagree about the scope of this trial.

Brodkin wants the trial limited to damages. Although she cited four grounds in her notice of motion, served on June 21, 2019, she argued that the ultimate amount of noneconomic damages ($225,000) was inadequate and that the verdict was "hopelessly ambiguous."

St. Joseph moved for an entirely new trial. The notice of motion, served on June 27, 2019, listed all seven issues listed in Code of Civil Procedure section 657 as grounds for the new trial. In its memorandum, however, St. Joseph argued only that the

12

non-economic damages verdict was inconsistent with the relevant jury instruction, thereby causing an irregularity in the proceedings. (Code Civ. Proc., § 657, subd. (1.).)

The trial court ruled in St. Joseph's favor, holding that "the verdict form did not have clear instruction as to how to properly calculate damages while avoiding duplicate damages of negligence and elder abuse." The verdict form could have confused the jurors, and the language of the special verdict regarding damages was not the same as the jury instruction.

We review an order granting a new trial for abuse of discretion, unless a question of law underlies the decision. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 859.)

In *Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, the court modified the trial court's new trial order to limit its scope to the single issue over which the trial court and the jury disagreed. (*Id.* at p. 457.) The court stated, "There is no reason to subject the parties and the courts to the expense and delay of retrial of those issues on which the jury and the trial court agreed and which are supported by the evidence. Where, as here, the trial court has reviewed the jury's special verdicts and has properly concluded that the jury's apportionment of damages is erroneous but that the damage award is incorrect only to the extent that it reflects an improper apportionment of liability, the trial court should have limited its new trial order to that issue. (*Ibid.*) The court also cited other cases in which "[o]ther jurisdictions have also separated damage issues from liability issues for purposes of limiting new trials where retrial of the entire case was not warranted. [Citations.]" (*Id.* at p. 458; see also *Sharp v. Automobile Club of Southern California* (1964) 225 Cal.App.2d 648, 653 ["there is no reason for having a second jury determine issues heretofore determined in the first trial."].)

In this case, the jury has already found liability on the part of St. Joseph. The problem with the verdict upon which the new trial order was based related solely to damages, specifically to the possibility of duplicate damages. That problem can be

13

eliminated in a new trial relating only to damages.  There is no basis for a new trial on liability.

## DISPOSITION

The order denying St. Joseph's motion for nonsuit is affirmed.  The order granting St. Joseph's motion for a complete new trial is reversed.  The order denying Brodkin's motion for a partial new trial is reversed, and the trial court is instructed to grant Brodkin's motion for a partial new trial.  The parties are to bear their own costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


14